In Re: Petition of the Board of Directors of the State Police Civic Association, a Pennsylvania Corporation. John T. Long et al., Appellants.

In Re: Petition of the Board of Directors of the State Police Civic Association, a Pennsylvania Corporation. Marshall G. Kinback et al., Appellants.

In Re: Petition of the Board of Directors of the State Police Civic Association, a Pennsylvania Corporation. Robert J. Zinsky, Appellant.

Argued May 12, 1983, before Judges WILLIAMS, JR., CRAIG and DOYLE, sitting as a panel of three.

*Gary M. Lightman*, with him *Anthony C. Busillo, II, Mancke, Lightman & Wagner*, for appellants, Long,

Miklic and Smith, and The State Police Conference of State Police Lodges of the Fraternal Order of Police (FOP).

*Ronald M. Katzman, Goldberg, Evans & Katzman, P.C.,* for appellants, Kinback, Tingley, Cronin, Smith and Cahalan, and the Retired State Police Association of Pennsylvania, Inc.

*John C. Sullivan, Nauman, Smith, Shissler & Hall,* for appellant, Robert J. Zinsky.

*G. Thomas Miller,* with him *Robert D. Stats, McNees, Wallace and Nurick,* for appellee.

OPINION BY JUDGE DOYLE, February 23, 1984:

Before this Court are appeals by the Retired State Police Association of Pennsylvania, Inc.[1] (RSPAP), the State Conference of State Police Lodges of the Fraternal Order of Police (FOP)[2] and Robert J. Zinsky,[3] from a decision and order of the Court of Common Pleas of Dauphin County adopting a receiver's report governing the distribution of the assets of the now defunct State Police Civic Association (SPCA). We affirm.

The SPCA, organized in 1917 as a fraternal society and chartered in 1922, was a not-for-profit corporation founded to fill a void in pension and general

[1] Individual members of the Retired State Police Association of Pennsylvania also appearing in this matter as named appellants are Marshall G. Kinback, Oscar N. Tingley, Arthur R. Cronin, Robert Smith and Thomas P. Cahalan.

[2] Individual members of the Fraternal Order of Police also appearing as named appellants in the instant case are John T. Long, Herman Miklic and Philip Smith.

[3] Robert J. Zinsky was an officer of the State Police Civic Association and ostensibly represents the interests of its Board of Directors and Officers.

benefits coverage for the Pennsylvania State Police. Membership in the SPCA was voluntary but, over the years, most members of the State Police joined as a matter of course. Pension benefits, distributed on a non-actuarial basis, were quite liberal. By 1949, however, it became evident that the liberal benefit payments, combined with a high number of members taking early retirement and increased membership, would soon result in a situation where the SPCA's liabilities would exceed its assets. To counteract the advent of such circumstances, the SPCA's Board of Directors (Board) convened and amended the SPCA's By-Laws to create two separate funds for accounting purposes, an "investment" fund and a "current income" account. In conjunction with the establishment of these funds it was also decided to restrict the dollar amount of the pensions paid in a given year to a portion of the income actually earned in the preceding year, with investment funds to be utilized for pensions only if income would not allow for a specified minimum pension payment. These changes were approved by a *unanimous* vote of the *entire* membership.

While the amendments adopted in 1949 accomplished their purpose for the time being, by 1961 an ever increasing number of retired members once again created a situation where pension liabilities portended to exceed income. Accordingly, the By-Laws were again amended, this time to eliminate all recourse to the investment fund for the payment of pensions. Also, dues were doubled and a refund policy was put into effect which permitted members resigning from the State Police after three years of service to receive back all dues paid in excess of $120.00 per annum. It was hoped that these steps would both solidify the SPCA's finances and serve as an inducement to young State Police officers to join and remain in the SPCA. The dues refund provision was further liberalized in

1969 to provide that all dues, less $120.00, would be refunded to any member who left his employment with the State Police and who was not yet eligible to receive a pension. It was also decided at that time to base dues payments on a percentage of the salary received by a first year graduate of the State Police Academy rather than a fixed figure. This created a hedge against inflation as dues increased when compensation increased. Unfortunately for the SPCA, the overall effect of the efforts to achieve fiscal solidity was decreased benefits at increased cost. It soon became evident to many of the newer members that, for the same price, they could obtain benefits from sources, such as commercially available deferred annuities, roughly twice that which could be received from the SPCA. Thus it was that in 1974, 450 members of the SPCA resigned, despite continuing to be employed by the Pennsylvania State Police.

Concerned with the situation confronting them, the Board appointed an outside consultant to conduct a study of the SPCA's future prospects. The consultant, comparing an estimate of the SPCA's liabilities with current assets, concluded that the SPCA's retirement plan was underfunded, that pension benefits would continue to diminish and that, all in all, there was little reason for younger members of the State Police to join the SPCA. The consultant further concluded that, to make the SPCA a sound and attractive investment, it would be necessary to amend the pension policy by decreasing benefits to retired members and increasing benefits for members who would be qualifying for pensions in the future. The theory behind the recommended changes was to make the pension program reflect the actuarial value of the contributions made by members to the fund. A report which contained the consultant's recommendations was distributed to the entire membership of the SPCA for its

consideration. A majority of the membership, however, refused to grant the approval necessary for the proposed changes to go into effect.

On August 29, 1974, a special meeting of the Board was convened to discuss the high resignation rate and the membership's refusal to adopt the consultant's recommendations. At that time the Board imposed a moratorium on the collection of dues[4] while it considered alternatives for the SPCA other than those presented by the consultant and complete dissolution. Several months thereafter a survey ballot was circulated to all SPCA members. The ballot contained five options for the SPCA's future including, *inter alia,* maintaining the status quo and dissolution. Based primarily on the response to the survey ballot, it was these two options which were presented at the SPCA's annual membership meeting held in May, 1975 and which were later distributed to the entire membership for a final vote. By a margin of almost three to one, the membership voted in favor of dissolving the SPCA.

Based on the adverse interests of the different classes of SPCA members, the Board, on June 26, 1975, filed a petition with the common pleas court sitting in equity requesting it to take judicial supervision of the SPCA's voluntary dissolution. The RSPAP filed an answer in opposition on the grounds that it had filed its own petition with the court seeking to have the SPCA placed in involuntary dissolution, that the vote of the membership to dissolve the SPCA was invalid and that the petition of the Board for judicial

---

[4] The moratorium was a postponement of dues payments, not a foregiveness. Since it resulted from official action by the Board, no notice was sent to members of the SPCA to the effect that dues were no longer being withheld from wages when due and, hence, under the By-Laws, there has been no forfeiture or suspension of membership rights.

supervision was procedurally defective. Prior to the court in equity issuing a ruling on the petition and answer, however, the Board filed a motion requesting a transfer of the matter to the orphans' court division based on the Board's assertion that the SPCA was a not-for-profit corporation holding property committed to a charitable purpose and that jurisdiction was therefore vested only in the orphans' court. Despite opposition to the propriety of such a transfer by the RSPAP, the motion was granted and the entire matter was transferred to orphans' court on February 13, 1976. An amended petition and the answer thereto were filed and on March 17, 1978, the RSPAP filed a motion to withdraw its opposition to a judicially supervised proceeding while reserving its right to raise its objections during the dissolution proceedings. This motion was granted on February 5, 1979[5] and, concomitant therewith, the court granted the petition of the Board and assumed judicial supervision of the dissolution process. The court then appointed a liquidating receiver who was charged with (1) collecting and consolidating all SPCA assets and satisfying proper obligations of the SPCA from the resulting fund; (2) developing a factual record upon which decisions concerning dissolution could be based and (3) preparing a report to the court containing findings of fact and a proposed schedule for distributing the SPCA's remaining assets.

On November 24, 1980, after hearings, the receiver filed with the court of common pleas a lengthy and detailed report containing findings of fact and recommendations concerning the distribution of the SPCA's assets. Pertinent among his conclusions were:

---

[5] Prior to addressing the RSPAP's motion to withdraw its opposition, the court of common pleas ruled that there was no forfeiture of membership rights resulting from the dues moratorium. *See supra* note 4.

A. Members of the SPCA actually receiving or eligible to receive pensions have a vested contractual right to the assets of the SPCA. They are therefore creditors with a priority claim over the claims of the general membership against those assets and must be awarded the present value of their pensions based on actuarial computations.

B. The actuarial calculation of the present value of SPCA member's pensions shall incorporate a 7% rate of return on bonds and securities held by the SPCA as investments.

C. Retired members, because they are entitled to their pensions, have no other claim against the surplus assets of the SPCA upon distribution thereof.

D. Those assets of the SPCA remaining after payment of creditors, must be distributed to the active membership on a pro rata, rather than a per capita, basis.

E. Active members of the SPCA neither forfeited their membership nor are liable for interest based on dues not paid pursuant to the Board's 1974 moratorium on the payment thereof. Active members will be entitled to their full share of the distribution upon payment of delinquent dues.

The court of common pleas approved the receiver's report by a decree nisi and the receiver was ordered to effect distribution of the SPCA's assets subject to the filing of exceptions. Exceptions to the receiver's report were filed by the parties to the instant appeal and they were denied by order of the common pleas court dated August 5, 1982. The instant appeal followed.

The issues pertinent to our resolution of this matter are:

A. Do members of the SPCA who are receiving or eligible to receive pensions have a vested contractual right such that renders them creditors to the SPCA thus entitled to priority treatment over other members upon dissolution?

B. Should the assets of the SPCA which remain after the satisfaction of creditors and other obligations be distributed to the membership on a pro rata or per capita basis?

C. Should those members of the SPCA who ceased paying dues pursuant to the 1974 moratorium on the payment thereof, be liable for interest on their outstanding dues balance?

These issues were raised by all the parties, with the exception of the issue of payment of interest on dues owed to the SPCA which was raised only by the RSPAP, and we will address them seriatim.

With respect to the issue of whether retired members of the SPCA possess a vested contractual right to their pensions, it is axiomatic that the relationship between a beneficial association such as the SPCA, and its members is a contractual one. *Marshall v. Pilots Association,* 206 Pa. 182, 55 A. 916 (1903). And where the application for membership in the association incorporates by reference the constitution and by-laws of the association, said constitution and by-laws become terms of the contract between the prospective member and the association upon approval of the membership application by the association. *Constructors' Association of Western Pennsylvania v. Furman,* 165 Pa. Superior Ct. 248, 67 A.2d 590 (1949). As a general rule, whenever specific rights of a member pursuant to the contract between himself and the association become fixed, such as with the vesting of a pension, subsequent amendments to the by-laws or constitution may not affect those rights. *Marshall.*

414

*See McCaffrey v. Pittsburgh Athletic Association,* 448 Pa. 151, 293 A.2d 51 (1972). This holds true for substantial rights even where the membership application itself contains an agreement by the prospective member, such as that entered into by the members of the SPCA, "to abide by the provisions of the Constitution and By-Laws of the Association now in force *or that may be subsequently adopted.*" (Emphasis added.) *Roblin v. Supreme Tent of the Knights of the Maccabees,* 269 Pa. 139, 112 A. 70 (1920). Under such circumstances, however, members for whom rights have not become fixed are bound by the provisions of amendments to the constitution and by-laws. *See Becker v. Berlin Benef. Society,* 144 Pa. 232, 22 A. 699 (1891). Moreover, *any* member may, by his actions, effectively waive or modify his contractual entitlements. *Elliott v. Lindquist,* 356 Pa. 385, 52 A.2d 180 (1947).

The key section of the SPCA's By-Laws insofar as this Court's analysis of contractual rights is concerned is Article IX, Section 4(c). It reads:

> Notwithstanding any other provisions of the by-laws to the contrary and subject to the limitations as hereinafter provided in this Section, all pensions, funeral expenses, death benefits, provision for artificial limbs and eyes and ordinary expenses of operation of the State Police Civic Association shall be paid from current income of the Association in the following manner:

> At the end of each calendar year hereafter, beginning with the calendar year ending December 31, 1960, *the Directors shall fix and determine the percentage of pensions which shall be due and payable during the ensuing year.* Such determination shall be predicated upon the ac-

tual experience of the year past, together with the anticipated experience which, *in the judgment of the Directors,* can reasonably be expected for the ensuing year. In so doing, the Directors shall set aside five percent (5%) of current income, as herein defined, for payment of ordinary operating expenses of the Association during the ensuing calendar year, funeral expenses, death benefits, provision for artificial limbs and eyes, and for the payment of such pensions during that ensuing calendar year to those persons pensioned after the first of such ensuing calendar year, provided that should the 5% of current income be insufficient during any calendar year, to pay all obligations chargeable to it the Board of Directors shall use sufficient investment funds to pay the balance of any such obligations and further provided that any investment funds so used shall be reimbursed from current income of such calendar year before computing available funds to pay pensions for the next calendar year. Pension payments under this provision shall be at the same percentage of pension as is paid to other pensioners during the same year. The remaining ninety-five percentum (95%) of current income, as herein defined, shall be allocated for the payment of pensions during the ensuing calendar year and shall constitute during the ensuing calendar year the sole source for payment of said pensions. (Emphasis added.)

The FOP asserts that Section 4(c) of the By-Laws, as formulated in the edition thereof in the record before this Court (dated July 3, 1969), should be construed to make the payment of a pension in a given year a qualified right contingent on a declaration by the Board. The Board therefore would possess the

416

discretion to conceivably declare no pension at all and no right to a set sum is created. This, the FOP argues, is consistent with the repeated refusals by the members of the SPCA to put the payment of pensions on an actuarial basis. Thus, any member of the SPCA whose pension rights vested subsequent to Section 4(c) having been amended to effectively read as it does in the 1969 version of the By-Laws, or who by his actions or conduct acquiesced in the deletion or modification of any unqualified pension rights he might otherwise have possessed, should not be properly found to have contractual rights establishing him as a creditor of the SPCA entitled to preferential treatment upon dissolution thereof.[6] We cannot accept this analysis. It is clear to this Court, as it was to the receiver, that the primary purpose of Section 4(c) was to restrict benefits payments, including pensions, to the current income of the SPCA. While Section 4(c) provides the mechanism by which current income is to be allocated for pension benefit payments, it in no way vests in the Board the discretion to declare no pension at all. The obligation to pay a pension was extant at all times and nothing in Section 4(c) permits it to be ignored. Accordingly, the receiver was correct in concluding that those members of the SPCA whose pensions had vested by virtue of their satisfaction of the

---

[6] Implicit in the argument of the FOP is that Section 4(c), as it now effectively reads, was the result of the amendment to the By-Laws effected by a unanimous vote of the membership (active and retired) in 1949. Thus, all members should be bound thereby and subject to the Board's exercise of discretion vis-a-vis the declaration of a pension and no member could today be properly found to have a vested contractual right to the present value of his pension. *See Elliott v. Lindquist*, 356 Pa. 385, 52 A.2d 180 (1947). Aside from the fact that we do not agree with this contention, the record is unclear in this regard and a remand would have been necessary to establish when Section 4(c) as it now effectively reads came into effect and who would be bound by its terms.

requirements established by the contract between themselves and the SPCA, *i.e.*, the By-Laws, have a contractual right to a pension benefit to be paid from the time of retirement. In the situation of members whose pension rights had vested at the time of the SPCA's dissolution but who had not yet actually retired, this benefit should be calculated from the date of the dissolution. And, as actual computations provide the only reasonable basis for assessing the extent of that right and fairly determining the present value thereof, we affirm the decision that pension vested members of the SPCA at the time of dissolution, both retired and active, are to be deemed creditors of the SPCA entitled to satisfaction of their contractual rights prior to any dissolution of surplus assets to the general membership. Moreover, because what is being addressed is a *contractual* right the scope of which exceeds Section 4(c)'s mechanical provisions, and because the By-Laws are mute as to the distribution of assets in the event of dissolution, we do not construe Section 4(c)'s provisions restricting the annual payment of pensions to 95% of current income to preclude the receiver from fashioning a remedy which requires a disbursement of assets other than those of the current income account. The pension vested members of the SPCA are *creditors* of the organization, and nothing separates them from any other creditor insofar as the SPCA's duty to satisfy its contractual obligation is concerned. All the funds of the SPCA must be treated as being available for this purpose and the decision of the receiver in this respect was correct.[7]

---

[7] Consistent with this holding, we must reject the SPCA's assertion that, because funds were allocated for the payment of pensions throughout 1975, but only paid for the five months of that year preceding dissolution, pensioners are entitled to a direct payment of the balance of those funds. The mechanical allocation of funds pursuant to Section 4(c) of the By-Laws is irrelevant to these

418

There still remains for us to address the matter of whether assets of the SPCA which are surplus to the satisfaction of creditors must be distributed on a pro rata or a per capita basis. Initially we note that we are addressing this issue as it pertains only to members of the SPCA whose pension rights had not yet vested at dissolution. This is consistent with the treatment afforded this issue by the receiver and the court of common pleas.[8] The contractual expectation of the pension vested members of the SPCA was that, upon retirement, they would be excused from further payments of dues and would instead receive a pension. The very objective of the SPCA was "to accumulate and maintain a fund from the dues paid by its members . . . with which to pay pensions . . . to members of the Association." Article II, Section 1 of the By-Laws. Pursuant to our decision above, pension vested members of the SPCA, while undeniably still members entitled to participate in SPCA proceedings[9] will have

proceedings. With respect to members who have vested contractual rights establishing a priority interest in the distribution of the SPCA's assets, we believe the record supports the computation by the receiver, affirmed by the trial court, of the present value of said contractual rights by using the projected income of the SPCA in each future year. There is also substantial evidence on the record, in the form of expert testimony by an actuary, to support the use of a rate of 7% as the future rate of return on the SPCA's investments. The facts that another expert favored a rate of return of 8% and that both experts believed a range of from 7% to 8.5% was reasonable, do not provide a basis for this Court to accept the RSPAP's argument that a higher rate of return should have been used.

[8] But see Reilly v. Walker Bros., 425 Pa. 1, 229 A.2d 457 (1967).
[9] Article IX, Section 11 of the By-Laws reads:
Whenever a member of this Association is granted a pension and placed on the pension rolls, he shall continue as a member of this Association without further payment of dues or assessments and shall have the same voting rights accorded other members.

their contractual expectancy fully realized. To allow them to also participate in the dissolution of the SPCA's surplus assets because of their technical status as members, would be to permit a recovery on the pension vested member's part which unfairly transcends any reasonable expectation they may have held upon entering into their membership contracts. The active members, on the other hand, while in good faith performing their obligations under the contract by paying dues, have now been thrust into a situation where their expectations, *i.e.*, the receipt of a pension from the SPCA when they retire, will never be realized. This gives rise to a secondary expectation, that they will receive a refund or restitution from that portion of the contract funds into which they have contributed. The receiver was correct in precluding pension vested members from sharing in the distribution of surplus assets as a means of ensuring that *all* members mutually achieve the greatest realization of their contractural expectations possible under the circumstances through minimal infringement on the expectations of the other membership classes.

As a not-for-profit corporation, the SPCA is governed by the provisions of the Corporation Not-for-profit Code (Code), 15 Pa. C. S. §§7101-8145. Section 7967(c) of the Code, 15 Pa. C. S. §7967(c),[10] states, in pertinent part:

Except as otherwise provided in a bylaw adopted by the members or in this article or by any other provision of law, any surplus remaining after paying or providing for all liabilities

[10] Section 7967(c) of the Code is controlling in this matter, despite the fact that this is a judicially supervised dissolution as opposed to a voluntary dissolution under the supervision of the Board. *See* Sections 7968(a) and 7985 of the Code, 15 Pa. C. S. §§7968(a) and 7985.

420

of the corporation shall be distributed by the board of directors or other body *to the shareholders, if any, pro rata, or if there be no shareholders, among the members per capita.* (Emphasis added.)

The SPCA's Certificate of Incorporation specifically states that it "has no capital stock" and the By-Laws do not authorize the issuance of stock. Given such a structure, the distribution of the SPCA's surplus assets to the members should arguably be conducted on a per capita basis. Section 7967(c) of the Code. *See DeChamplain v. P & R Home Association,* 171 Pa. Superior Ct. 420, 90 A.2d 603 (1952). It is manifest, however, that, under the circumstances encompassing the current state of the SPCA, a per capita distribution of assets would be grossly inequitable. A member of one day's standing would take a share equal to that of a member of nineteen or more years, despite the latter's phenomenally greater contribution to the pool of assets being distributed, and also what is likely a greater dependence on the SPCA for future financial security. In short, new members would receive a windfall to the distinct and severe harm of older members. The receiver, in his equitable mode, recognized this potential inequity and, in rendering a determination in favor of a pro rata distribution in his report, later affirmed by the common pleas court, he stated:

Application of the general rule contained in Section 7967(c) of the Corporation Not-For-Profit Code would also be inapplicable to the Association because its By-Laws, when read as a whole, do not support a per capita distribution. Although the Receiver recognizes that there is no provision in the By-Laws specifically concerning distribution on liquidation which would override the general rule of the

Corporation Not-For-Profit Code, the Receiver believes that liquidation cannot occur in a manner contrary to the basic framework of the Association provided in the By-Laws. The Association was established to pay benefits to members from its assets and such payments are typically based upon periods of contributions. The principal benefit provision, Article IX, Section 4 on service pensions, measures a member's entitlement on the basis of the periods during which he has paid dues. Similarly, both Articles VIII, Section 5 and Article IX, Section 4 require that a member's pension benefit be reduced proportionately for any dues which are unpaid. In addition, Article IX, Section 10 dealing with death benefits and Article IX, Section 11 dealing with refunds use a member's total dues contribution when determining the amount to be distributed. Thus, the Association benefit and refund provisions are based on dues contribution and it would be inconsistent with that system to make a per capita distribution to members upon liquidation. The Receiver concludes therefore that the Association By-Laws are consistent with and support the use of a pro rata distribution upon liquidation.

Further, the word "shareholders", used in the Corporation Not-For-Profit Code to indicate when a pro rata distribution should occur, may not be inconsistent with the type of relationship which actually existed between the Association and its members. The Receiver believes it necessary to determine whether the use of the word "shareholders" in the Corporation Not-For-Profit Code means only persons holding *stock certificates* issued by the Corporation or whether that term also includes a system of

accounts which would record a member's right to share in the assets of the Association. Because there are no cases decided under Section 7967(c) of the Corporation Not-For-Profit Code, the Receiver has looked to other sources for guidance on this issue.

The Corporation Not-For-Profit Code does not define the term "stock" although it does define "member" as follows:

One having membership rights in a corporation in accordance with the provisions of its bylaws. . . . The term shall be construed to include "shareholder" if the corporation issues shares of stock.

Although this definition of member reinforces the distinction between members and shareholders on the basis of issued stock, it does not answer the question concerning what is "stock" for purposes of the Corporation Not-For-Profit Code.

. . . .

Although the Receiver recognizes that the Association did not issue certificates of stock to its members, this is not determinative on the issue whether members held rights to the assets in proportion to their contributions. A certificate of stock is not stock itself but mere evidence of ownership of stock. In re Donsavage's Estate, 420 Pa. 587, 218 A.2d 112 (1966); Mills v. Jacobs, 131 Pa. Superior Ct. 469, 200 A. 233 (1938), *modified on other grounds* 333 Pa. 231, 4 A.2d 152 (1939). And, although it has been held that certificates are evidence of title to stock, they are not necessary for stock to exist. Commonwealth v. Nixon, 94 Pa. Superior Ct. 333 (1928). Further, the statement in the Cer-

tificate of Incorporation that the "Corporation has no capital stock" would not, in a technical sense, refer to the issuance of shares denoting rights in Corporation assets. The term "capital stock" refers to that amount, stated either in the Charter or Articles of Incorporation, as the initial contribution to be paid into the Corporation or fixed as the basis for conducting the business of the Corporation. See Person & Riegel Company v. Lipps, 219 Pa. 99, 647 A. 1081 (1907); 18 C.J.S. Corporations §193. Thus, the statement in the Certificate of Incorporation concerning capital stock only means that the Association would not need a minimum amount of capital contribution before it could engage in activities in furtherance of its stated purposes.

Based on the foregoing analysis, the Receiver concludes that the Association By-Laws support the use of a pro rata distribution upon liquidation. The Association was established for the payment of its assets to qualified members and such payments are typically based upon periods of contributions. To distribute the assets among all members per capita at this time would be inconsistent with that logic and effect an injustice to those members who had contributed to the fund for many years. For these reasons, the receiver concludes that the rights of all members to share in the Association assets remaining after the payment of creditors and members entitled to pension benefits should be made in proportion to their total contributions.

We are constrained to agree with this analysis. Accordingly, we affirm the decision on appeal here to distribute the surplus assets of the SPCA upon dissolution to the active membership on a pro rata basis.

424

The final issue which we must now address[11] is that of whether interest is owed on outstanding dues balances resulting from the moratorium declared in 1974. In its brief, the RSPAP, in espousing the payment of interest, quite simply states "[h]ad the delinquent members paid their dues when they *should* have, these monies would have been available for investment and interest earnings at the very high rates that were derived from the other assets." (Emphasis added.) What the RSPAP ignores, however, is that the non-payment of dues by members was not the result of a decision on the member's part not to pay, but rather it resulted from a decision by the Board *not to collect,*

[11] Significant in its omission from the issues raised before this Court is the receiver's ruling that, as a result of the unanimous approval of all members of the amendments to the By-Laws enacted in 1949

> properly enacted amendments to the Association's By-Laws affecting the terms of the contract were valid prospectively as to all Association members not then entitled to benefits since they had agreed to be bound by subsequent by-law changes. Changes to the By-Laws affecting the vested rights of members entitled to benefits are also valid because members receiving benefits consented to the By-Law amendment which changed the nature of the pension benefit from a fixed amount to a variable amount based upon income received by the fund. Because By-Law amendments were applicable to all the members, the Receiver needs to review only the benefit provisions contained in the By-Laws which were effective at the time the Association elected to dissolve.

As discussed *supra*, once pension rights vest, they are fixed and subsequent amendments to the by-laws, unless specifically acquiesced in by each pension vested member, are not binding, despite a blanket agreement to be bound by subsequent amendments. Thus, had the issue been raised, this Court would have been constrained to find the receiver in error and a remand would have been necessary to establish which by-laws, and hence, which rights, pertained to each pension vested member of the SPCA. The issue was not raised, however, and the parties are now precluded from challinging the receiver's determination by the passage of time. Pa. R.A.P. 903.

a decision the propriety of which has not yet been challenged. The nonpayment of dues was an involuntary act insofar as the active members were concerned and we perceive no rational ground for now imposing a penalty against those members in the form of interest on their outstanding dues balances. This is in contrast to the requirement that actual dues balances be paid prior to a member being allowed to participate in the final distribution. As referenced *supra* at footnote 4, the moratorium, at its inception, was clearly only a postponement, not a forgiveness. There is thus no other way to construe the imposition of interest payments on members who would be required to pay fairly significant amounts of back-dues other than as the imposition of a penalty.

## ORDER

Now, February 23, 1984, the decision and order of the Orphans' Court Division of the Court of Common Pleas of Dauphin County dated August 5, 1982 overruling exceptions to its Decree Nisi which approved the report of the Liquidating Receiver in the above captioned matter, dated August 5, 1982, is hereby affirmed.