**Frank H. ABBOTT and Vincent P. Haley, Appellees**

v.

**SCHNADER, HARRISON, SEGAL & LEWIS, LLP, Appellant**

Superior Court of Pennsylvania.

Argued Oct. 23, 2001.

Filed July 30, 2002.

---

Paul H. Titus, Philadelphia, for appellant.

Alfred W. Putnam, Philadelphia, for appellees.

Before: JOHNSON, TODD, and KELLY, JJ.

TODD, J.

¶ 1 In this breach of contract action, Schnader, Harrison, Segal, & Lewis, LLP ("Schnader") appeals the trial court's order denying its motion for summary judgment and granting the motion for summary judgment filed by Appellees Frank H. Abbott ("Abbott") and Vincent P. Haley ("Haley").[1] The essential question presented in this appeal is whether active partners may amend a provision of a partnership agreement providing for income to retired partners, substantially reducing that income, without the consent of the retired partners. This is a question of first impression in the appellate courts of this Commonwealth. Upon review, we affirm, finding the amendment ineffective to reduce Appellees' retirement benefits once they had retired.

¶ 2 The trial court, by the Honorable John W. Herron, accurately and succinctly summarized the facts underlying this action as follows:

Schnader is a law firm founded in 1935 and headquartered in Philadelphia, Pennsylvania. Abbott's career at Schnader spanned forty-four years, first as an associate for eleven years and then as a partner from 1960 through January 1, 1993 [when his retirement was man-

---

1. As discussed below, Appellees' complaint included claims for promissory estoppel and breach of duty of good faith in addition to a breach of contract claim. The trial court stated in a footnote to its opinion that the grant of summary judgment pertained only to the breach of contract claim, noting that such a conclusion "removes the need to consider the Plaintiffs' tertiary claim, based on Schnader's alleged breach of the duty of good faith" and stating as well that "both sides acknowledge that the Plaintiffs' promissory estoppel claim is not yet ripe for decision." (Trial Court Opinion, 2/28/01, at 1 n. 1.) Because of this, this Court questioned whether the order appealed from was interlocutory. On limited remand, the trial court certified that the February 28, 2001 Order was intended to be a final order, since it granted all the relief Appellees sought in this litigation, and dismissed Appellees' outstanding claims as moot. (Trial Court Order, 2/6/02.) Accordingly, we will address the merits of the present appeal.

dated under the partnership agreement at the age of 65]. Haley likewise worked at Schnader for forty years, as an associate from 1959 and then as a partner from 1968 until January 1, 1999 [when his retirement was likewise mandated, although he agreed with Schnader to continue to work for an additional year].

On May 31, 1984, the Parties entered into a partnership agreement ("Agreement") that is at the center of the controversy in this case. The agreement addressed a variety of issues of partnership management such as the partners' capital and drawing accounts, division of profits and election of the Firm's executive committee. The Parties' dispute, however, focuses on the relationship between an *amendment provision in Article* II, Section 2.06(d) [2] and Article VII, which grants retirement benefits for Firm partners ("Partners") who have served for twenty-five years.

Article VII was titled "Retirement of Partners" and provided for income benefits for retired Partners who satisfied certain conditions. According to Section 7.04, those Partners who had given twenty-five calendar years of service to the Firm were "entitled" to "retired partner payment benefits":

> Section 7.04. *Minimum Years of Service.* A partner must have at least twenty-five (25) full calendar years of service with the firm as a partner or as an associate (which need not be consecutive) to be entitled to the full retired partner payment benefits provided under this Article.

These "Benefits" are more fully described in Agreement Section 7.02,

which, prior to December 1999, read as follows:

> Section 7.02. *Income of a Retired Partner.* For each year a retired partner shall receive from the Firm, payable monthly, an amount equal to thirty percent (30%) of the average of the partner's five (5) highest annual shares of partnership income during the seven (7) years prior to the effective date of his retirement (subject to section 7.03) as shown on Line 1, ordinary income (loss) (or any successor line or provision) on such partner's federal Schedule K–1 (or any successor schedule), as adjusted for any amounts included on such line paid by the Firm that are not charged or credited to all partners on a per partner or proportionate basis, for such years, subject to minimum and maximum annual amounts of fifty thousand dollars ($50,000) and one hundred thousand dollars ($100,000).

In [Section 2.06], the Agreement outlined "votes required for Certain Actions." The vote required to amend the Agreement was [75%]. Both parties concede that under this provision only active Partners may vote on amending the Agreement.

Under the Benefits provisions of Article VII, effective January 1, 2000, Abbott would have been entitled to receive Benefits at an annual rate of $91,745.76 under the pre-December 1999 agreement. This amount would have increased to $94,257.76 on March 31, 2000. For Haley, the corresponding amounts would have been $91,990.96 and $94,509.67.

On December 23, 1999, the Partners enacted a series of amendments

---

**2.** The disputed amendment provision is Section 2.06(d) of the agreement as amended in 1999. However, in the 1984 version of the agreement, the same provision was Section 2.06(e).

("Amendments") including one that revised Section 7.02 to read as follows:

(a)(i) A retired partner whose effective date of retirement was prior to January 1, 2000 shall receive from the Firm the lesser of (x) the amount which he or she was receiving on an annual basis during calendar year 1999 and (y) $50,000, on an annual basis, payable monthly, during such retired partner's lifetime but not to exceed a period of ten years from the effective date of his or her retirement. . . .

(b) Subject to the provisions of Section 7.02(a), the amount of annual payments to a retired partner shall be initially calculated as thirty percent (30%) of the average of the partner's five (5) highest annual shares of partnership income during the seven (7) years prior to the effective date of his or her retirement (subject to Section 7.03) as shown on Line 1, ordinary income (loss) (or any successor line or provision) on such partner's federal Schedule K-1 (or any successor form or schedule), as adjusted for any amounts included on such line paid by the Firm that are not charged or credited to all partners on a per partner or proportionate basis, for such years.

The amendments have the practical effect of capping Abbott's and Haley's Benefits at $50,000 per year and limiting the period of compensation to ten years from the date of retirement of each. Although the Amendments were adopted in accordance with section 2.06(d) of the Agreement, which allows the Agreement to be amended with the consent of seventy-five percent (75%) of all Partners, neither Abbott nor Haley consented to the adoption of the Amendments.

(Trial Court Opinion, 2/28/01, at 2–4 (citations omitted) (footnotes omitted).)

¶ 3 As a result of this reduction in retirement benefits, Appellees brought suit in June 2000, asserting causes of action for breach of contract, promissory estoppel, and breach of the duty of good faith. The parties filed cross-motions for summary judgment on stipulated facts. The trial court granted Appellees' motion for summary judgment on their contract claim, concluding that they were entitled to the pre–1999 payment benefits, dismissed as moot Appellees' remaining claims,[3] and denied Schnader's motion in its entirety.

¶ 4 In concluding that Appellees were entitled to relief, the trial court treated the retirement provision of the partnership agreement, which it concluded was severable from the remainder of the agreement, as an offer by Schnader to enter into a unilateral contract, to be accepted by satisfying the retirement benefit conditions. (Trial Court Opinion, 2/28/01, at 7–10.) Accordingly, Appellees' rights to the retirement benefits vested when they completed 25 years of service and retired after age 65. (*Id.* at 11–15.) Finding no Pennsylvania cases on point and relying on *Kemmerer v. ICI Americas Inc.*, 70 F.3d 281 (3d Cir.1995), the trial court concluded that the amendment provision in the agreement was ineffective to preclude vesting, as the provision did not explicitly reserve the right to amend the agreement and apply such amendment to partners who had retired.[4]

---

**3.** *See supra* note 1.

**4.** We note that, although retirement benefits are at issue, the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.*

("ERISA") does not apply here as the only participants in the partnership agreement—the "benefit plan"—are the partners. *See McNeil v. Time Ins. Co.*, 205 F.3d 179, 190 n.

¶ 5 On appeal, Schnader presents the following questions for our review:

1. Where a comprehensive written partnership agreement provides that it can be amended and places no restrictions on the right to amend, are retirement benefits under the Agreement nevertheless "vested" and unamendable?

(a) May the retirement benefit provisions in that agreement be severed from the rest of the partnership agreement to create a separate unilateral contract governed by principles derived from employment contracts?

(b) Where one sentence in a paragraph of the agreement defines what percentage of benefits may be paid to retired partners with 25 years of service to the Firm (i) may that sentence be treated as an "offer" to enter into a unilateral contract that creates "vested" benefits; (ii) may future service as a partner under that provision be deemed "consideration" for the benefits although the Uniform Partnership Act prohibits compensation for such service, and (iii) may benefits be considered "vested" under the provision even though the service to the partnership was rendered before the "offer" was made?

(c) Is a general unqualified power of amendment in the partnership agreement ineffective when it is applied to the benefit provisions in it?

2. Should a plaintiff be precluded from recovery on claims of estoppel and breach of a duty of good faith where those claims are based on a reliance on benefits under an agreement that could be amended at any time?

(Appellant's Brief, at 2.)

¶ 6 Summary judgment properly is granted after the close of the relevant pleadings "whenever there is no genuine issue of any material fact as to a necessary element of the cause of action or defense which could be established by additional discovery or expert report" and the moving party is entitled to judgment as a matter of law. Pa.R.C.P. 1035.2(1). The scope of our review of an order granting or denying a motion for summary judgment is well established. In reviewing an order granting summary judgment, an appellate court must examine the record in the light most favorable to the non-moving party. *Curbee, Ltd. v. Rhubart,* 406 Pa.Super. 505, 509, 594 A.2d 733, 735 (1991); *Laventhol & Horwath v. Dependable Ins. Assoc., Inc.,* 396 Pa.Super. 553, 558, 579 A.2d 388, 390 (1990). We will reverse only if there has been an error of law or a clear abuse of discretion. *Hetrick v. Apollo Gas Co.,* 415 Pa.Super. 189, 194, 608 A.2d 1074, 1077 (1992).

¶ 7 The relationship between partners in a partnership derives from the partnership agreement:

The substantive rights of a partner consist only of those specified in the partnership agreement, and, in appraising this bundle of rights, the agreement cannot be disregarded. Indeed, the agreement must be viewed as the pre-eminent factor in valuing a partner's rights.

*McCabe v. McCabe,* 525 Pa. 25, 30, 575 A.2d 87, 89 (1990); *see also O'Donnell v. McLoughlin,* 386 Pa. 187, 191, 125 A.2d 370, 372 (1956) ("A true partnership relation flows from a contract between the parties thereto either express or implied.... [T]he provisions of such a con-

17 (5th Cir.2000) ("a plan in which the only participants are the owners or partners does not constitute an ERISA benefit plan").

tract is the law of the partnership between the partners.").

■■■ ¶ 8 The interpretation of any contract is a question of law and this Court's scope of review is plenary. *Highmark Inc. v. Hospital Serv. Ass'n Of Northeastern Pa.,* 785 A.2d 93, 98 (Pa.Super.2001), *appeal denied,* 568 Pa. 720, 797 A.2d 914 (2002). Moreover, "[w]e need not defer to the conclusions of the trial court and are free to draw our own inferences. In interpreting a contract, the ultimate goal is to ascertain and give effect to the intent of the parties as reasonably manifested by the language of their written agreement." *Id.* When construing agreements involving clear and unambiguous terms, this Court need only examine the writing itself to give effect to the parties' understanding. *Kelaco v. Davis & McKean Gen. P'ship,* 743 A.2d 525, 528 (Pa.Super.1999). This Court must construe the contract only as written and may not modify the plain meaning under the guise of interpretation. *Little v. Little,* 441 Pa.Super. 185, 190, 657 A.2d 12, 15 (1995).

¶ 9 Having completed 25 years of service by the age of 65, Appellees retired before the 1999 amendment to the partnership agreement was enacted.[5] This amendment substantially reduced the retirement benefits to which Appellees otherwise would have been entitled (by approximately 1/2) and shortened the period over which they could be received. Appellees assert, as the trial court found, that the 1999 amendment was ineffectual as to them, as their contractual right to retirement benefits had vested at retire-

ment and the amendment provision could not be applied to abrogate these rights post-retirement, frustrating their reasonable expectation to the contrary. Schnader asserts, on the other hand, that the retirement benefit provisions are part of a fully integrated document and the amendment provision, which is unrestricted in scope, unambiguously provides for amendments, including, it asserts, amendments to the retirement provision as applied to partners who have retired.

■■■ ¶ 10 The issue before this Court is whether a partnership agreement may be amended to reduce substantially retirement income to retired partners, and, as we have noted, is a matter of first impression for the appellate courts of Pennsylvania. Nevertheless, we find guidance in reported decisions from this Commonwealth concerning the vesting of contract rights generally as well as cases regarding contractual retirement benefits of public and private employees and the vesting of contractual benefits in the context of civic and beneficial associations. In addition, we find persuasive a line of federal cases from the Third Circuit concerning the effectiveness of a right to amend such retirement benefits after the performance which triggered the benefits. Ultimately, we conclude that the amendment provision was ineffective to reduce Appellees' retirement benefits once they had retired.

■■■ ¶ 11 As an initial matter, we note that the trial court viewed the retirement benefits provision as akin to an offer by Schnader to enter into a unilateral contract[6] severable from the remainder of the agreement. While unilateral contract

---

5. Although Haley continued at Schnader for an additional year (until January 1, 2000) under a provision of the partnership agreement providing for discretionary extensions, he had been required to retire under the agreement on January 1, 1999, and his benefits were calculated using that date.

6. "A unilateral contract is a contract wherein one party makes a promissory offer which calls for the other party to accept by rendering a performance." *Martin v. Capital Cities Media, Inc.* 354 Pa.Super. 199, 211, 511 A.2d 830, 836 (1986) (citing Restatement (Second) of Contracts § 45).

analysis helps conceptually, Pennsylvania cases discuss vesting apart from such an analytical structure. Moreover, we do not find that severability is implicated here.[7] Apart from the fact that the agreement appears to be fully integrated, there is no contention that the amendment provision applies, but, rather, the issue becomes whether it is sufficiently definite to preclude vesting.[8]

¶ 12 A vested right is one that is fixed and without condition. *Pleasant Hills Constr. Co., Inc. v. Borough of Rankin*, 707 A.2d 639, 642 (Pa.Cmwlth.1998); *see also J.R.W., Inc. v. Manchester Borough Council*, 148 Pa.Cmwlth. 238, 243, 610 A.2d 1078, 1081 (1992) ("A vested right is an: 'Immediate or fixed right to present or future enjoyment and one that does not depend on an event that is uncertain.'" (quoting Black's Law Dictionary, 5th Ed., at 1402)). A long line of cases in this Commonwealth discusses the notion of the vesting of contractual rights, particularly

**7.** This case does not present the situation where one party to a contract is attempting to avoid performance because of a breach by the other party. In such situations, it would be relevant whether or not the pertinent provisions of a contract were severable, as the non-breaching party could be relieved of performance if the provisions were not severable, but still required to perform if they were severable. *See, e.g., Heilwood Fuel Co. v. Manor Real Estate Co.*, 405 Pa. 319, 175 A.2d 880 (1961) (property exchange provisions of contract were severable from lease provisions such that one party could seek specific performance of exchange provisions without concomitant performance of lease obligations). This case does not present the question of whether one contract may give rise to separate causes of action. *See, e.g., Glasgow, Inc. v. Commonwealth of Pa., Dep't of Transp.*, 108 Pa.Cmwlth. 48, 529 A.2d 576 (1987) (highway construction contract was severable into several separate items such that action initiated in order to recover upon these separate items were not essentially the same cause of action for res judicata analysis); *Pennsylvania Tpk. Comm'n v. Atlantic Richfield Co.*, 31 Pa. Cmwlth. 212, 375 A.2d 890 (1977) (each payment due under turnpike lease contract was separate obligation for purposes of statute of limitations), *aff'd*, 482 Pa. 615, 394 A.2d 491 (1978). Nor does this case present the issue of whether severability is necessary to preserve enforcement of the remainder of the agreement. *See, e.g., Flightways Corp. v. Keystone Helicopter Corp.*, 459 Pa. 660, 331 A.2d 184 (1975) (general attack on contract for fraud is to be decided under applicable arbitration provision as severable part of contract and only where claim of fraud in inducement goes specifically to arbitration provisions itself should it be adjudicated by court rather than arbitrator). Rather, this case presents the somewhat more routine situation where, following one party's performance on a contract, the other party refuses to carry out its part of the bargain (i.e., it breaches). Accordingly, Schnader's objections on the grounds that the retirement provision is not severable are not germane.

**8.** Schnader argues that *Gladstone v. McHenry Med. Group*, 197 Ill.App.3d 194, 143 Ill.Dec. 188, 553 N.E.2d 1174 (1990), suggests otherwise. We disagree. In *Gladstone*, a medical partnership agreement provided a portion of partnership income to a retirement account for two of the founding partners, until they were 65. This benefit was not tied to their continued participation in the partnership—it was recognition for their past substantial efforts as founding partners. Long after the provision was added, the remaining partners amended the partnership agreement—in accordance with its amendment provision that allowed amendment by a majority vote of the partners—to delete the benefit, and one of the founding partners sued. The partner argued that the benefit provision was severable from the rest of the partnership agreement, thus was not subject to the amendment provision. The court ruled that the provision was not severable, *inter alia*, because only past consideration supported the provision, and thus the amendment provision applied. *Id.* at 1180–81. Thus, *Gladstone* differs from the instant case in that *Gladstone* did not involve a retirement plan or benefit *based on future performance*. Further, as we have noted, the question here is not whether the amendment provision applies to the benefits provision, but whether the amendment provision precludes vesting.

the vesting of retirement benefits. Our Supreme Court has stated:

> Until an employee has earned his retirement pay, or until the time arrives when he may retire, his retirement pay is but an inchoate right; but when the conditions are satisfied, at that time retirement pay becomes a vested right of which the person entitled thereto cannot be deprived; it has ripened into a full contractual obligation.

*Retirement Board of Allegheny County v. McGovern*, 316 Pa. 161, 169, 174 A. 400, 404–05 (1934); *see also Newport Township v. Margalis*, 110 Pa.Cmwlth. 611, 615, 532 A.2d 1263, 1265 (1987) (quoting *McGovern* for the proposition that retirement compensation is "earned in the present, payable in the future to the employee, provided he ... complies with the terms, conditions and regulations imposed on the receipt of retirement pay"); *Apgar v. State Employes' Retirement System*, 655 A.2d 185, 188 (Pa.Cmwlth.1994) ("Our courts continue to recognize that '[o]nce a contractual obligation vests, no matter how innocuous it may appear, the same cannot be altered, amended or changed by unilateral action.'" (quoting *Zimmerman v. Officers and Employees Retirement Bd.*, 503 Pa. 219, 224, 469 A.2d 141, 144 (1983) (concurring opinion of Zappala, J.))).

¶ 13 In *McGovern*, the Court held that a public employee's vested right to retirement benefits could not be abrogated by subsequent legislation. *See also Newport Township v. Margalis, supra* (employee who complied with conditions of retirement

plan was entitled to promised health benefits despite municipality's amendment following employee's retirement eliminating such benefits). However, this principle applies to private employees as well. *See David v. Veitscher Magnesitwerke Actien Gesellschaft*, 348 Pa. 335, 342, 35 A.2d 346, 349 (1944); *Bilec v. Auburn & Assoc. Pension Trust*, 403 Pa.Super. 176, 588 A.2d 538 (1991).

 ¶ 14 Once an employee's contractual rights to benefits vest, they cannot be denied. *See Thelin v. Borough of Warren*, 118 Pa.Cmwlth. 336, 338, 544 A.2d 1135, 1136 (1988) ("An employee's pension rights vest when he or she has satisfied all prerequisites under the plan."); *Municipality of Hermitage v. Hickory Township Fraternal Order of Police Lodge No. 82*, 89 Pa. Cmwlth. 325, 492 A.2d 494, 495 (1985) (unused sick leave benefits were, at termination, a vested contractual right which could not be denied); *Bilec, supra* (employer properly denied pension benefits where employee satisfied length of service requirement but not age requirement for benefit vesting).

¶ 15 Schnader maintains that these employer-employee cases are not relevant because the relationship between partners in a partnership differs from the relationship between an employer and employee. While we do not disagree that the relationships differ, nevertheless, we conclude that the notion of the vesting of contractual retirement benefits is a generalizable one.

 ¶ 16 This is exemplified by cases concerning civic or beneficial associations,[9]

---

**9.** A fraternal benefit society is "[a]ny incorporated society, order or supreme lodge without capital stock, including one exempted under the provisions of [40 P.S. § 1142–616(a)(2) ] whether incorporated or not, conducted solely for the benefit of its members and their beneficiaries and not for profit, operated on a lodge system with or without ritualistic form

of work, having a representative form of government and providing benefits in accordance with this act is hereby declared to be a fraternal benefit society." 40 P.S. § 1142–103. *See generally* 40 P.S. § 1142–101 to –701; Summary of Pennsylvania Jurisprudence 2d, § 2:14–2:20.

where the relationship between members is more akin to relations between partners in a partnership, as members in such associations, directly or indirectly, prescribe the rules by which the association operates. In this regard, we find *In re Board of Directors of the State Police Civic Ass'n*, 80 Pa.Cmwlth. 405, 472 A.2d 731 (1984), to be most instructive.[10] That case concerned the distribution of the assets of the State Police Civic Association (the "Association"), a fraternal society organized in 1917 to provide supplemental pension and other benefits to the Pennsylvania State Police, apart from those already provided by the Commonwealth. The Association, after a solid start, went through several attempts at restructuring to address financial problems which resulted from a lopsided ratio of retired members to active members. Ultimately, in 1975 the membership voted to dissolve, and the board petitioned the court to supervise a voluntary dissolution. Among the disputed issues was whether members who were already receiving or already eligible for pension benefits took priority over the remaining members in the distribution following dissolution. Discussing whether the retired members of the Association possessed a vested right to their pensions, the Commonwealth Court explained that "[a]s a general rule, whenever specific rights of a member pursuant to the contract between himself and the association become fixed, such as with the vesting of a pension, subsequent amendments to the by-laws or constitution may not affect those rights." *Id.* at 413–14, 472 A.2d at 736.

¶ 17 The Court concluded that members' rights were "vested" if they had already retired, or were eligible to retire, before dissolution; such members

> are to be deemed creditors of the [Association] entitled to satisfaction of their contractual rights prior to any dissolution of surplus assets to the general membership.... The pension vested members of the [Association] are *creditors* of the organization, and nothing separates them from any other creditor insofar as the [Association's] duty to satisfy its contractual obligation is concerned.

*Id.* at 417, 472 A.2d at 737 (emphasis original); *see also David v. Veitscher Magnesitwerke Actien Gesellschaft, supra* (status between pensioner and company was one of creditor and debtor).[11]

¶ 18 Other decisions concerning civic or beneficial associations, although some substantially older, support the same thesis: that contractual retirement or other benefits may vest, and thereafter cannot be abrogated. *See Roblin v. Supreme Tent of the Knights of the Maccabees of the World*, 269 Pa. 139, 112 A. 70 (1920) (amendment to society's by-laws which effectively precluded death benefits to member's wife was ineffectual as it was enacted after his presumptive death, despite membership contract binding member to subsequently adopted by-laws); *Marshall v. Pilots' Ass'n*, 206 Pa. 182, 184, 55 A. 916, 916 (1903) ("When subsequently the association chose to alter its by-laws in order to differentiate disabilities and class them as temporary or permanent, with different

---

**10.** Although decisions of the Commonwealth Court are not binding on this Court, we frequently turn to the decisions of our colleagues for guidance. *See Kraus v. Taylor*, 710 A.2d 1142, 1144 (Pa.Super.1998).

**11.** The court's notion of vesting was further illuminated given that it entertained, although

ultimately rejected, an auxiliary argument regarding an amendment to the by-laws made *before* certain pensioners rights had vested. *See In re Board of Directors of the State Police Civic Ass'n*, 80 Pa.Cmwlth. at 415–17, 472 A.2d at 737.

results in regard to benefits, it could not affect the rights of plaintiff already vested."). *Cf. McCaffrey v. Pittsburgh Athletic Ass'n,* 448 Pa. 151, 293 A.2d 51 (1972) (holding that transferability of membership in athletic association was not vested property right exempt from change by by-laws as membership transferability was explicitly premised on provisions of by-laws); *Chambers v. Supreme Tent of the Knights of the Maccabees of the World,* 200 Pa. 244, 49 A. 784 (1901) (member's wife not entitled to payment of member's death benefit where amendment to by-laws making him ineligible for benefit was executed before his death).

¶ 19 The only Pennsylvania decision shedding light on partners' ability to amend a partnership agreement, *Kornstein v. Taylor,* 68 Pa. D. & C.2d 7 (C.P. Philadelphia County), *aff'd without opinion,* 229 Pa.Super. 751, 322 A.2d 369 (1974), follows an analytical approach similar to *In re Board of Directors of the State Police Civic Ass'n, supra.* In *Kornstein,* limited partners sought to withdraw from a partnership and recoup their investments, as provided in the partnership agreement. Subsequent to the limited partners' effective withdrawals, the general partners voted to dissolve the partnership, and amended the partnership agreement, providing that current and former limited partners be repaid their investments on a pro rata basis only after the firm's debts had been paid through disso-

lution. The court ruled that the amendment was ineffectual to abrogate the rights of the limited partners and recoup their investments: "They are basic rights of the 'limited' partners under their contract between themselves. As such, they cannot be modified as to any 'limited' partner without his consent." *Id.* at 11 (citing *Clarkson v. Crawford,* 285 Pa. 299, 132 A. 350 (1926)). Particularly relevant to the present case, as we discuss below, the court noted that the partnership agreement did "not contain any provision giving the remaining partners the right to dissolve the partnership retroactively." *Id.* at 13.

¶ 20 The implication of these cases is that, under certain circumstances, contractual retirement benefits vest, and once vesting occurs, the right "cannot be altered, amended, or changed by unilateral action." *Apgar,* 655 A.2d at 188. Here, there is no dispute that Appellees satisfied all conditions necessary to receive retirement benefits under the partnership agreement.

¶ 21 Schnader argues, however, that the retirement benefits provision could not be deemed to have vested because of the broad amendment provision in the partnership agreement, which provided that a vote of 75% of the active partners could "amend" the agreement.[12] Put another way, Schnader argues that Appellees never had any absolute contractual right to

---

12. Section 2.06, the amendment provision of the partnership agreement, states:

*Votes Required for Certain Actions.* Action to effect the following matters shall require the affirmative vote of the partners entitled to cast at least the indicated number of the votes which all partners (whether or not present and whether or not voting) are entitled to cast on the basis of one vote per partner:

 (a) To elect or remove an Executive Committee member, forty percent (40%) . . . ;

 (b) To open a new branch office or discontinue an existing branch office . . . a majority;

 (c) To merge with or acquire another firm, whether or not involving the creation of a new office location, involving one or more new partners, seventy-five percent (75%);

 *(d) To amend this Agreement, seventy-five percent (75%).*

(Partnership Agreement, 1/19/98, at 3–4 (R.374–375a) (emphasis added)).

retirement benefits, because the right to receive such benefits was qualified by the ability of the partnership to amend that provision of the agreement at any time. Under this interpretation, the retirement benefits were incapable of vesting, and, as a result, the promise of such benefits was entirely illusory. Appellees assert, on the other hand, that the right to "amend" the agreement is insufficient to prevent the vesting of their retirement benefits. Framed for us, therefore, is the question of when an amendment provision in a contract may prevent retirement rights from vesting.

¶ 22 On this point, and finding a lack of Pennsylvania cases on the subject, the trial court looked to other jurisdictions. Based on its review of cases concerning benefit plans, the trial court identified three possibilities regarding how an amendment provision affects vesting: (1) the amendment provision controls, such that a reservation of the right to amend vitiates the promise of benefits, making it illusory; (2) the benefits provision controls, despite a reservation of a right to amend; and (3) an explicit reservation of the right to amend a benefits provision is required to avoid vesting. (Trial Court Opinion, 2/28/01, at 15–21.) We need not review the first two approaches in any more detail, as we agree with the trial court that both are flawed:

> Neither takes into account the specific language of the amendment or benefits provision in the specific agreement in question. Moreover, both imply extreme consequences: the first could serve to nullify retirement benefits in spite of the recipient's completed per-

formance and reasonable expectation that his/her benefits were secure. The second, in turn, would invalidate amendment provisions in retirement plans, regardless of their specificity or prominence, thereby depriving the partnership or plan provider of desirable flexibility.

(Trial Court Opinion, 2/28/01, at 19–20.)

¶ 23 Rather, we agree with the trial court that a more moderate approach is represented by a line of cases from the United States Court of Appeals for the Third Circuit, exemplified by *Kemmerer v. ICI Americas Inc.*, 70 F.3d 281 (3d Cir. 1995). In *Kemmerer*, that court interpreted a top hat plan[13] that permitted plan participants to elect a payment schedule by which they would receive their retirement benefits. The plaintiffs elected an extended payment schedule, and later retired. Following their retirement, the company unilaterally terminated the top hat plan and, against the plaintiffs' elections, paid the remaining amounts due in three annual installments. *Id.* at 285.

¶ 24 The Third Circuit affirmed the trial court's conclusion that this more rapid payment schedule was a breach of the plan.[14] Examining the contract as a whole, the court found that a unilateral contract was created which vested rights in those employees who accepted the offer it contained by continuing in the company's employment until retirement: "Under unilateral contract principles, once the employee performs, the offer becomes irrevocable, the contract is completed, and the employer is required to comply with its side of the

---

**13.** "A top hat plan is a plan which is unfunded and is maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly trained employees." *In re New Valley Corp.*, 89 F.3d 143, 148 (3d Cir.1996) (internal quotation marks omitted).

**14.** Although the court concluded that the plan was subject to ERISA, it explicitly relied on contract principles to resolve the dispute. *Id.* at 287.

bargain." *Id.* at 287. However, the company argued that the plan did not restrict its right to terminate, which was to be presumed, and so it could terminate the plan even after performance by the plaintiffs. The court rejected this argument, holding that "even when a plan reserves to the sponsor an explicit right to terminate the plan, acceptance by performance closes that door under unilateral contract principles (unless an explicit right to terminate or amend after the participants' performance is reserved)." *Id.* at 287–88. The court added that "any other interpretation ... would make the Plan's several specific and mandatory provisions ineffective, rendering the promises embodied therein completely illusory." *Id.* at 288 (quoting *Carr v. First Nationwide Bank,* 816 F.Supp. 1476, 1494 (N.D.Cal.1993)). The company's claim to an unfettered right to terminate in the face of specific grants of benefits "ha[d] no basis in contract law" and was "more than minimally unfair." *Id.* at 287.

¶ 25 Implicit in the *Kemmerer* decision was a recognition of the exceptional interpretation which the company asked to be given to the plan: that even *post-performance,* the company had a right to terminate the plan, *retroactively* invalidating rights it was reasonable for the employee to presume were fixed. As a subsequent case explained:

The court's reasoning [in *Kemmerer*] can be captured in a simple illustration. If an employee is promised $10 per hour effective Monday, and told that her wage can be reduced at any time, and on Wednesday her wage is cut to $5 effective Thursday, her employer cannot refuse on pay day to give her $10 per hour

for her work on Monday through Wednesday. Far from requiring that the employer express an explicit intent to pay $10 per hour for Monday through Wednesday's work notwithstanding the employer's freedom to reduce wages at any time, the Third Circuit held that what would have to be preserved explicitly would be an employer's right to apply the reduced wage *retroactively* to Monday through Wednesday's work. A contrary rule would lack any basis in contract law and would render the employer's promise under the unilateral contract wholly illusory.

*Amatuzio v. Gandalf Systems Corp.,* 994 F.Supp. 253, 266 (D.N.J.1998) (emphasis original) (footnote and citations omitted).

¶ 26 We find the *Kemmerer* approach to be a reasonable one and consistent with Pennsylvania law. *See Kornstein,* 68 Pa. D. & C.2d at 13 (amendment to partnership agreement denying plaintiffs partnership interest prior to dissolution ineffective where agreement did "not contain any provision giving the remaining partners the right to dissolve the partnership retroactively"); *Levitt v. Billy Penn Corp.,* 219 Pa.Super. 499, 504, 283 A.2d 873, 875 (1971) (rejecting argument that employee who resigned prior to retirement age lost pension rights because, *inter alia,* the terms of the plan did "not explicitly state that if an employee resigns from the company he has no rights under the plan"). This approach recognizes the reasonable expectation that contractual retirement benefits may not be abrogated after the performance which has triggered them, without an explicit reservation of the power to do so.[15]

---

15. Consistent with this result is *In re New Valley Corp.,* 89 F.3d 143, 151 (3d Cir.1996). There, a deferred compensation plan like that in *Kemmerer* provided that it could be termi-

nated "at any time". *Id.* The court determined that this provision was ambiguous as applied post-retirement. As in *Amatuzio, supra,* the court concluded that it was reason-

¶ 27 In light of the caselaw discussed above supporting the vesting of retirement benefits and our recognition of the exceptional nature of a power to retroactively amend retirement benefits expressed in *Kemmerer*, we find Appellees' construction of the contract—that once they retired their rights vested and could not be reduced by amendment—to be reasonable. Further, in the context of the agreement as a whole and its amendment history, we conclude that Appellees' interpretation is the *only* reasonable one.

¶ 28 That the agreement emphatically states that "a retired partner *shall receive* from the Firm" certain retirement pay (Partnership Agreement, at § 7.02 (emphasis added)), is consistent with an intention that such rights vest. Further, Appellees identify provisions in the agreement which expressly set forth the circumstances in which a retired partner's pension can be reduced, implying that had the parties intended the retirement benefits to be subject to amendment as Schnader contends, they could have done so. For example, the agreement provides that partners retiring before the age of 65 receive a pro rata reduction in benefits (Agreement, § 7.04); the agreement provides that pensions benefits may be adjusted based on cost-of-living indices and the average per-partner income (*id.*

§ 7.06); and the agreement caps the aggregate payments the firm may be required to make (*id.* § 11.02).

¶ 29 Moreover, a 1997 amendment to these provisions, which reduced retirement income, explicitly applied only to partners retiring *after* the amendment.[16] Finally, we find it difficult to accept an interpretation of the partnership agreement that would make the promise of retirement benefits wholly illusory.

¶ 30 Schnader's arguments to the contrary are not persuasive. For the reasons that we have discussed, we reject Schnader's contention that the amendment provision is sufficiently explicit and broad to apply retroactively. Further, Schnader's references to the agreement's history are unavailing. First, it asserts that the fact that the amendment provision previously carved out an exception requiring the additional vote of a specific partner[17] suggests that an unrestricted interpretation of the clause is reasonable. However, that exception was an idiosyncratic provision related to the death benefits of one specific partner, and we cannot conclude it has any bearing on the matter before us.

¶ 31 Second, Schnader asserts that previous amendments to the retirement provision imply that the amendment provision was understood to apply to retired part-

---

able for an employee not to expect reductions post-performance. *Id.* Noting the emphatic terminology of the benefits provisions—that benefits "will be paid" or "will be provided"—the court concluded that the termination clause was ambiguous: "If New Valley desired to clearly indicate its ability to terminate benefits even after performance, in the face of likely expectations to the contrary, it could have simply added the words 'including after retirement' to the plan". *Id.*

16. In 1997, Section 7.10 was added which reduced partner retirement income by 2½%

times the number of years after January 1, 1998 that a partner retired, but the amendment only applied to partners retiring thereafter.

17. The 1984 version of Section 2.06 of the partnership agreement provided that "[t]o amend this Agreement, seventy-five percent (75%), including, in the case of a proposed amendment of Section 8.05, the vote of Bernard G. Segal." (Partnership Agreement of 5/31/84, § 2.06(e).) Section 8.05 concerned death benefits peculiar to Segal. (*Id.* § 8.05.)

ners. However, we agree with the trial court that, but for a nominal exception, prior amendments did not affect the rights of retired partners.[18] (*See* Trial Court Opinion, 2/28/01, at 22–24.) Indeed, as already noted, the 1997 amendment which did reduce retirement payments explicitly applied only to partners retiring after the amendment. While we recognize that Appellees were involved in the management of the firm while the agreement was drafted, and were sophisticated lawyers who understood the tradeoffs involved in drafting such a document, we nevertheless conclude it was reasonable to expect that their retirement benefits could not be reduced after retirement.[19] As, under the circumstances, we find that Appellees' conclusion is the only reasonable construction of the amendment provision, we conclude the amendment provision was ineffective to reduce their retirement payments once they retired.

¶ 32 We do not consider this conclusion to be especially onerous, as Schnader suggests. It would have been a straightforward matter for the agreement to explicitly state that the retirement benefits provision could be amended to apply to a retired partner. This would have made explicit what is otherwise unexpected and, in light of the other evidence presented, what we find to be an unreasonable interpretation of the agreement: that its general amendment provision may retroactively abrogate retirement rights. Schnader asserts that it is unfair to apply the *Kemmerer* analysis to an agreement established before *Kemmerer* was decided. But by relying on *Kemmerer* we are not establishing a new rule of law; instead, we are recognizing, in light of the caselaw of this Commonwealth concerning the vesting of analogous rights, the exceptional nature of the suggestion that a general amendment provision in partnership agreement can, essentially, apply retroactively. This acknowledgment, combined with a lack of evidence that the parties intended otherwise, leads us to conclude the 1999 amendment was ineffective as to Appellees.

¶ 33 Accordingly, we affirm the order of the trial court granting summary judg-

---

18. For example, a 1993 amendment changed the default period for the repayment of the capital accounts of retiring partners; but this period has always been subject to alteration by the firm's executive committee. The nominal exception which *did* affect retired partners was a 1995 amendment which made discretionary the firm's obligation to provide office space and staff support to retired partners, and specified how the firm's income would be calculated from its federal tax return. But, as the trial court stated, "there is no indication that the limitation on participation in benefit programs or the move to a K–1 based [tax return] calculation had any practical effect." (Trial Court Opinion, 2/28/01, at 24.)

19. Schnader asserts that *In re Unisys Corp. Retiree Med. Benefit "ERISA" Litigation*, 58 F.3d 896 (3d Cir.1995), supports their arguments that that the 1999 amendment provision was effective as to Appellees. We dis-

agree. There, the court found that the medical benefit plan's promise of a "lifetime" benefits could be abrogated under a provision reserving the right to amend or terminate the plan "at any time" and for "any … reason". *Id.* at 904–05. While the court found this language to be unambiguous, its ultimate conclusion that the benefits had not vested was buttressed by factual conclusions based on extrinsic evidence that the parties had not intended to vest the benefits. *Id.* at 905–06. Among this evidence was the fact that the company had explicitly used the term "vested" in a plan for its top level executives, but had failed to use like terminology in the employee plan at issue. *Id.* at 905. Here, by contrast, the history of amendments to the partnership agreement supports our holding as it shows that the provision has not been applied to affect, in any substantial way, the benefits of retired partners.

ment to Appellees.[20]

¶ 34 Order affirmed.

**20.** Given our resolution of the contract issue, we need not reach Schnader's remaining is- sues on appeal.