# Hansen v. Hansen

*Andrew M. Milz, Cary L. Flitter* and *Theodore E. Lorenz,* for plaintiff.

*Thomas S. Myers Jr.,* for defendants.

BURR, *J.,* August 31, 2010—The defendant, Stuart R. Hansen, appeals from this court's order granting supplementary relief to the plaintiff, Roslyn K. Hansen, in aid of execution on the judgment she lawfully obtained pursuant to a verdict from this court on April 21, 2006 following a non-jury trial in an action to obtain specific enforcement of a buy/sell provision of a 1995 amended partnership agreement between the defendant and his late brother, plaintiff's deceased husband, George C. Hansen Jr. The amended partnership agreement required the brothers to purchase the survivor's 50 percent in the partnership upon one or the other's death, and when the defendant refused to tender the purchase price of $1,000,000, *i.e.,* the value of an insurance policy maintained for that purpose, to the plaintiff, George C. Hansen's widow and executrix of his estate, she sued for specific performance of the buy/sell agreement.

To this date, the defendant has refused to pay the entirety of this judgment, which amounted to $1,000,000 less certain set-offs to cover outstanding debts owed by George Hansen to the company, plus interest dating from approximately 60 days from the date of his death.

The defendant's refusal to pay the remainder of the judgment owed to the plaintiff remains puzzling in the face of trial testimony that the company was solvent and brought in millions of dollars yearly in profit, as well as disturbing, given post-trial discovery testimony obtained in aid of execution which tends to establish that much of

the company's present day income is being paid to the defendant as "wages and salary." The latter evidence raises an inference of possible fraudulent transfer of those funds in order to prevent the plaintiff from collecting her lawfully obtained recompense for her husband's one-half share in the defendant, The Hansen Paper Company Inc.

This court's verdict rested on a trial record that is replete with testimony from the defendant that he considered the buy/sell provision of the 1995 agreement null and void even before George Hansen's death based on debts the latter had incurred with and on behalf of the company, yet defendant never attempted to legally dissolve the partnership pursuant to express terms of the agreement. The record adduces that George Hansen was in the process of paying down his share of that debt at the time of his death, and that the defendant's reluctance to eject his brother from the business was based on a desire to keep his brother's contributions coming into the company until it had been fully recompensed for the losses. The defendant also has repeatedly indicated that his actions in refusing to honor the buy/sell provision after his brother's death and assuming the company's proceeds entirely for himself and his wife were derived from his own interpretation of the "law of the partnership," and with no reference whatsoever to, nor any regard for, the tenets and requirements the business partnership law of this Commonwealth. The court concluded that the defendant was required to implement the buy/sell provision of the agreement which necessitated the purchase of George Hansen's share of the business from the plaintiff. It is equally certain under the law that the defendant had no right or power to convey George Hansen's

50 percent share therein to his wife, Sue Hansen, as is now here alleged, prior to acquiring its ownership from the plaintiff.

The following references, paragraphs 1 through 21, inclusive, excerpted from this court's opinion in *Hansen v. Hansen,* 93 Del. 342 (2006), following the appeal from the denial of the parties' post-verdict motions are both salient and supportive of the foregoing conclusions.[1]

(1) George C. Hansen Jr. suffered a heart attack and died on August 6, 2001. At the time of his death, he owned a 50 percent share of The Hansen Paper Company (the company), a Pennsylvania general partnership which brokered the sale of paper, that was headquartered at 13 E. Central Ave., Paoli, PA. The defendant, Stuart Hansen, George's brother, owned the other 50 percent interest in the company, which, pursuant to further amendment to the 1995 amended partnership agreement (the agreement) that was executed by the brothers on November 28, 2000 (the amendment), he controlled managerially at the time of George's death. The defendant, Sue G. Hansen, is Stuart Hansen's wife. The defendant, The Hansen Paper Company Inc., (the corporation), is a Pennsylvania corporation formed by the defendants, Stuart and Sue Hansen, by the entireties, on January 7, 2002 to succeed the company in the paper brokerage business, and is also headquartered at 13 E. Central Avenue, Paoli, PA. (*Id.,* p. 343.)

---

1. This court's disposition of the parties' post-verdict motions was affirmed by the Pennsylvania Superior Court, after which the Pennsylvania Supreme Court denied allowance of further appeal. *Hansen v. Hansen,* 945 A.2d 774 (Pa. Super. 2007) (table), *appeal denied,* 598 Pa. 759, 955 A.2d 358 (2008) (table).

(2) The plaintiff, Roslyn Hansen, her late husband's designated sole beneficiary, fiduciary, and executrix of his estate, received letters of administration on August 27, 2001 and, on September 24, 2001, tendered her husband's 50 percent share in the company to the defendant, Stuart Hansen for purchase. (Trial exhibits P-6, P-7.) The agreement called for the surviving partner to purchase the deceased's half interest and to fund the purchase by way of an insurance policy on the other's life at an agreed upon price. At the time of George Hansen's death, pursuant to express terms of the brothers' agreement, their respective half shares in the company were valued at $1,000,000 each. When the defendant, Stuart Hansen, refused to honor the buy/sell provision of the partnership agreement and kept the insurance proceeds for the benefit of himself, his family and his new corporation, the plaintiff filed the instant complaint seeking judgment against Stuart R. and Sue G. Hansen in the amount of $1,000,000 on the subject insurance proceeds and a return of a $500,000 payment she had made to extinguish loans she and her husband had acquired from Bryn Mawr Trust for infusion of capital into the company following a business loss attributed to George from doing business with an entity known as the Edwards Paper Company. (*Id.,* pp. 343-344.)

(3) Plaintiff pleaded that these damages be awarded in her alternative capacities as an individual, or as her husband's representative, or as both. The grounds alleged for the requested relief were that the defendant, Stuart Hansen, had breached the buy/sell provision of the partnership agreement by retaining the proceeds from the insurance purchased for the purpose of acquiring George's share of the partnership. Plaintiff alleged fur-

ther that, in conjunction and conspiracy with his wife, the defendant, Sue Hansen, the defendant initially authorized the payment of the insurance proceeds to Bryn Mawr Trust Company to pay off the $500,000 in loans they had also obtained from the bank to cover the Edwards loss. Plaintiff contended that defendant applied the remainder of the insurance proceeds to the company's line of credit and converted the sums in excess thereof to pay for their personal needs and expenses. (*Id.*, p. 344.)

(4) Plaintiff further alleged that the defendants converted the assets of the partnership into the defendant corporation, for which articles of incorporation had been filed on January 7, 2002, for the purpose of placing them out of plaintiff's reach and defrauding her from her rights to the insurance proceeds and to her husband's share in the company's assets, income and profits.[2] Plaintiff additionally complained that, after George's death had caused a dissolution of the partnership, the defendant, Stuart Hansen, failed to indemnify her $500,000 loan payment and breached his fiduciary duties to the partnership by converting its assets and treating its income as personally belonging to him and his wife; in willfully failing to conclude the company's business as provided in the terms of the agreement; in refusing to allow plaintiff access to the company's books and records, pension and profit sharing plans; in refusing to recognize plaintiff as her deceased husband's successor in interest to his

---

2. The subject stock certificate was placed in evidence by the defendant to support his assertion in defense of plaintiff's plea for relief in execution on this judgment that he and his wife owned the company jointly and that assets owned by the entirety could not be reached in execution.

share in the company and to distribute to plaintiff her late husband's share thereof. (*Id.*)

(5) The partnership agreement executed by George and Stuart Hansen on June 5, 1995, provided, with regard to any lifetime transfer of their partnership interests, that "no partner shall withdraw from or cause a dissolution of the partnership or otherwise dispose of all or part of the partner's interest in the partnership." (Agreement, trial exhibit P-9, p. 7, article XI, section A.) The agreement provided, in reference to transfers on the death of a partner and in clear mandatory language, that "the partnership shall not be terminated by the death of a partner, and that 60 days following qualification as such, the legatee of the deceased partner shall offer to the surviving partner and the surviving partner shall purchase the partnership interest of the deceased partner for the price or consideration and on the terms set forth in section B of article XII of this agreement." (Agreement, trial exhibit P-9, pp. 9-10, article XI, section C, subsections 1-2.) (*Id.,* p. 346.)

(6) Article XII, section B of the agreement governs "transfers on death of a partner" and provides, in subsection 1 thereof, that the price at which the foregoing half interest would be offered as last stated herein ($1,000,000) or in schedule A of the agreement (on p. 20 thereof, which stated the value of the company as $1,000.000). (Agreement, trial exhibit P-9, p. 12, article XII, section A, subsection 3.) Subsection 2 of section B of article XII provides that "the surviving partner shall pay the purchase price in immediately collectible funds to the successor in interest of the deceased partner within 10 business days after the later of (i) the date of the offer

(September 24, 2001) or (ii) the date (October 5, 2001) on which the surviving partner receives the proceeds of the life insurance policy on the life of the deceased partner purchased by the surviving partner (and described on schedule B to this agreement (on p. 21 thereof, providing that the policy on Stuart owned by George, the deceased, was New England Life Insurance Policy no. 08561878, and the one on George, the deceased, owned by Stuart, was New England Life Insurance Policy no. 08638222)) to fund the surviving partner's obligations under this agreement." (Agreement, trial exhibit P-9, p. 12, article XII, section B, subsection 2.) (*Id.*)

(7) The record reflects that the defendant, Stuart Hansen, received death proceeds in the amount of $1,004,111.16 from the insurance policy kept on his brother, George, on October 5, 2001, some two months after George's demise, and that $71,883.27 of this amount represented part of a settlement of a class action lawsuit against the insurance company. (6/6/05 N.T. 20-23, trial exhibits P-1 and P-2.) William Brams, the agent who arranged for the partnership buyout policies, testified that defendant received this "extra death benefit" because George had died during a window of time during which defendant, as the policyholder and member of the class, was eligible to receive it. (6/6/05 N.T. 26-28.) The witness said that the actual policy on George paid only $932,337.89 in benefits instead of $1,000,000, and that the discrepancy represented a subtraction for loans taken by defendant against the policy. (6/6/05 N.T. 26.) (*Id.*, p. 347.)

(8) The plaintiff presented at trial the testimony of the defendant, Stuart Hansen, as if on cross-examination . . . When asked why he had not honored the buy/sell agree-

ment, defendant replied: "Well, . . . [t]he number one reason was I didn't feel like the [p]artnership agreement was in effect because my [brother] had breached it in [sic] so many occasions by lying, cheating and actually stealing to the point of grand theft." (6/7/05 N.T. 11.) . . . Even though there was only one such instance pleaded of George's alleged breach of the agreement by selling to non-credit worthy customers, *i.e.,* the Edwards account, the defendant claimed at trial there were "many" such instances that allegedly took place prior to the 2000 amendment to the agreement that motivated him not to transfer the insurance proceeds to the plaintiff. (6/7/05 N.T. 12-13.) . . . The defendant testified that, while he had a vague notion he was supposed to do so, he had not timely decided whether he was going to transfer the insurance proceeds to the plaintiff because "our business was in such a shambles and so deeply in debt . . . I couldn't have cared less about what the [p]artnership agreement said . . . I was trying to save our company." (6/7/05 N.T. 25-26.) Nevertheless, and despite testimony that he was ignorant of the buy/sell provision of the agreement at the time, defendant has insisted throughout this litigation that due to the purported actions of his brother George in going against his wishes in the matter of the Edwards account, he possessed the right to unilaterally decide that he was not required "to pay." (6/7/05 N.T. 42.) (*Id.,* pp. 347-48, passim.)

(9) The defendant testified that, with their large line of credit at Bryn Mawr Trust, the brothers' only recourse following the Edwards loss was to borrow money secured by mortgages on their homes in May and November of 2000 and invest the $1,000,000 acquired in that fashion as a capital contribution to the company. (6/8/05 N.T.

153-56.) The defendant said the brothers agreed also to contribute their 1999 and 2000 income tax refunds of $30,000 and approximately $89,000 each, respectively, to cover the Edwards loss, but that in September of 2001, plaintiff told him she was not going to give him the check for George's 2000 refund in the amount of $88,941.98. (6/8/05 N.T. 181-92; trial exhibit D-5.) . . . [A]dding these sums together with an additional $100,000 each borrowed on their partnership insurance policies and from Jean King, their mother, brings an intended total of approximately $1,440,000 in joint contributions by the brothers to reimburse the company for the Edwards loss. (*Id.*, pp. 348-49.)

(10) When asked by the court why he had not followed the agreement's contractual remedy of dissolving the partnership because of George's business mistakes, the defendant replied:

"The real problem, your honor, was that we owed so much money to the paper mills and the bank, if we had broken the partnership it would have all cascaded and come tumbling down. And I would have lost my business, as well as George. We would have lost our houses. We would have lost the shirts off our back." (6/8/05 N.T. 153.)

Thus, although the defendant and his brother George acted together to face and solve the Edwards problem, and in fact did so together to save the company, the defendant insists that George's breach of an oral promise not to sell more than a certain amount of paper to Edwards worked a material breach of the agreement to the point where it was irretrievably broken before George fulfilled his obligation to rescue the company from the

consequences of the bad business mistake here complained of as voiding the agreement. The inescapable conclusion is that the defendant did not take steps to timely dissolve this partnership so he could benefit from his brother's assistance to save and replenish the business, then willfully and even maliciously deprived his brother's family of the benefits thereof after his brother was dead. (*Id.,* p. 349.)

(11) The defendant readily admitted ignoring plaintiff's offer to sell George's share of the company on or about September 24, 2001, and then depositing the buy/sell insurance proceeds in the bank on his own behalf on October 5, 2001, and using all sums in excess thereof to pay household bills. (6/7/05 N.T. 27-28.) The defendant also admitted that there was approximately $457,000 in insurance benefits recovered on the Edwards Paper Company losses which had occurred from November of 1999 through [May] of 2000, when Edwards went bankrupt. (6/7/05 N.T. 29-30.) Defendant stated that the Edwards loss amounted to $1,663,000 after the insurance was paid on the total of $2,120,000 claimed to have been lost. (6/7/05 N.T. 29.) Defendant said later that the company had also received some $42,000 from the bankruptcy court, but still maintained that the losses from the Edwards account were around $1,660,000. (6/7/05 N.T. 35.) Despite his contention that, because of the Edwards loss, he was still laboring to "save" the company, defendant testified that he had increased his $2,500 per week base salary augmented with additional sums to "pay off his loans to the bank" to $6,000 per week base salary beginning on the date of George's death on August 6, 2001 in addition to receiving other miscellaneous cash disbursements for personal and family expenses paid on

his behalf from company funds. (6/7/05 N.T. 53-67; trial exhibit P-26.) Defendant conveniently did not recall a company check issued to him in the amount of $129,000 during the period of August 6 and December 1, 2001. (6/7/05 N.T. 73; trial exhibit P-28.) (*Id.*)

(12) According to (the company's controller, Diane) Tilghman, the Hansen brothers contributed $630,000 apiece to the company to cover the Edwards loss, although this accounts only for the $500,000 taken by George and Stuart and their wives in personal loans, and the borrowing of $100,000 on the insurance policies they kept on each others' lives and from their mother, plus the $30,000 each had received as refunds on their 1999 income tax returns. (6/8/05 N.T. 105.) Sums later to be added to the brothers' half-share contributions to the company were the $89,000 each pledged from their 2000 income tax refunds, which, had George lived to contribute his tax refund, would have brought the total amount of the brothers' cash infusion into the company to $1,638,000, an amount clearly sufficient to show the brothers' intentions of jointly covering the Edwards loss. Vincent Burns, the company's accountant concurred with all testimony from Ms. Tilghman pertaining to the Edwards loss, which Burns computed at $1,673,641.47, and which Burns agreed was made up by the brothers' collective capital infusion of approximately $1,437,000 into the company, minus the $89,000 tax refund which plaintiff refuse to give to the defendant. (6/7/05 N.T. 180-206.) (*Id.*, pp. 350-51.)

(13) When asked if he had actually read the agreement, defendant replied, "not entirely", and that "I asked my attorney what is the law of the partnership?" (6/8/05 N.T.

208-209.) . . . When asked again why he didn't just end the partnership, defendant reiterated, "because if the partnership ended, . . . the entire house of cards would have come tumbling down;" because he would have been going against their mother's wishes; and because he would have lost everything if he had done so. (6/8/05 N.T. 234-36.) . . . In contrast to the defendant's gloom and doom depiction of the partnership's finances, the company's accountant, Vincent Burns, using the defendants' IRS reports, testified that the business had remained a going concern that recorded gross receipts of $23,289,936 and a gross profit of $1,124,026 in 2003 and that the defendant and his wife had reported $448,952 in adjusted gross income related to the business for that year. (6/7/05 N.T. 142-45.) Mr. Burns said that defendant had instructed him to stop the partnership accounting effective August 6, 2001, and that in his own opinion, the successor to George's interest therein was the estate. (6/7/05 N.T. 148.) The witness said that he had, from that point, identified all the assets, liabilities, and so forth for the estate, and the result was an $82,000 loss in 2003, half of which the defendant used for IRS purposes to reduce the amount of his income. (6/7/05 N.T. 148-49.) . . . Mr. Burns indicated that, beginning on July 1, 2002, when the defendant claimed the corporation went into effect, it reported S corporation gross receipts of $7,706,820 and a gross profit of $590,848, from which the defendant received $288,000. (6/7/05 N.T. 152-53, 156.) The witness further testified that $47,000 of the foregoing amount represented a benefit from the Edwards loss. (6/7/05 N.T. 166.) Mr. Burns said that gross receipts of the company from January 1 through June 30, 2002 were $6,177,125, with a net profit of $143,927 and that

defendant's total gross income for that year was $431,000. (6/7/05 N.T. 158-61.) Mr. Burns' testimony stands in stark contrast to the defendant's remonstrances that the company is "barely hanging in there" and remains millions of dollars in debt to this day. (6/7/05 N.T. 155.) Indeed, for 2001, the year following the Edwards losses and in which his brother died, the defendant reported to the IRS adjusted gross yearly income of $277,951, and a company profit of $329,930 in the months prior to George's death on August 6, 2001, and of $190,657 during the second half of that year through December 31, 2001. (6/7/05 N.T. 162, 164-65.) (*Id.,* pp. 352-355, passim.)

(14) Following the conclusion of the trial and the submission of proposed findings of fact and conclusions of law by the parties, the court entered the following verdict:

"And now, April 21, 2006, after a non jury trial of the matters alleged in the case hereinabove captioned at no. 03-07117, and a hearing on defendants' motion to reconsider their petition to strike the lis pendens imposed in the matter hereinabove captioned at no. 03-12065, as well as thorough and careful consideration of the parties' proposed findings of fact and conclusions of law and the evidentiary submissions proffered in connection therewith, a verdict is hereby entered in favor of the plaintiff, Roslyn K. Hansen, individually and in her own right, and as executrix and personal representative of the estate of her late husband, George C. Hansen Jr., and against the defendant, Stuart R. Hansen, only, in the amount of $1,000,000 to be offset by damages awarded to the defendant, Stuart R. Hansen, only, on his counterclaims

against the plaintiff, Roslyn K. Hansen, solely as executrix and personal representative of the estate of George C. Hansen Jr., plus legal interest from October 15, 2001, said interest to be calculated following deduction of the set-offs awarded to the defendant, Stuart R. Hansen, only, as set forth below. 15 Pa.C.S. §8331 (rules determining rights and duties of partners); 15 Pa.C.S. 8334 (partner accountable as fiduciary); 15 Pa.C.S. 8364 (rights of estate of deceased partner when business is continued without settlement of accounts); January 5, 1955 Hansen Paper Company partnership agreement, article XI, section C; article XII, section B 1 and 2 and schedule A; and November 28, 2000 amendment to Hansen Paper Company partnership agreement.

"A verdict is hereby entered in favor of the defendant, Stuart R. Hansen, only, and against the plaintiff, Roslyn K. Hansen, solely as executrix and personal representative of the estate of George C. Hansen Jr., on the defendant's Count One and Count Three counterclaims alleging George C. Hansen Jr.'s wrongful acts and breach of trust in the handling of partnership business with regard to Edwards Paper Company in the amount of $88,941.98 as a set-off from the damages awarded against him to the plaintiff, Roslyn K. Hansen, solely as executrix and personal representative of the estate of George C. Hansen Jr. 15 Pa.C.S. §8327 (all partners are liable jointly and severally for everything chargeable to the partnership under sections 8325 (relating to wrongful act of partner) and 8326 (relating to breach of trust of partner and for all other debts and obligations of the partnership)); January 5, 1995 Hansen Paper partnership agreement, article VII, section A (the net profits of the partnership shall be divided between the partners and the net losses

shall be borne by the partners in proportion to their [50 percent] share in the partnership); article XI, section B 2 (iv) and (v) (other partner, after 10 (days) notice to disabled partner to cure any default in the performance of the terms of the partnership agreement shall have the right to purchase disabled partner's interest at the price fixed in section A of article XII thereof, or to dissolve the partnership); and November 28, 2000 amendment to Hansen Paper Company partnership agreement.

"A verdict is hereby entered in favor of the defendant, Stuart R. Hansen, only, and against the plaintiff, Roslyn K. Hansen, solely as executrix and personal representative of the estate of George C. Hansen Jr., on the defendant's count two counterclaim alleging George C. Hansen Jr.'s wrongful acts and breach of trust as to Hansen Paper Company funds pertaining to David Sjong, in the amount of $10,000 as a set-off from the damages awarded against him to the plaintiff, Roslyn K. Hansen, solely as executrix and personal representative of the estate of George C. Hansen Jr. 15 Pa.C.S. §8327 (all partners are liable jointly and severally for everything chargeable to the partnership under sections 8325 (relating to wrongful act of partner) and 8326 (relating to breach of trust of partner and for all other debts and obligations of the partnership)); January 5, 1995 Hansen Paper Partnership agreement, article VII, section A (the net profits of the partnership shall be divided between the partners and the net losses shall be borne by the partners in proportion to their [50 percent] share in the partnership); article XI, section B 2 (iv) and (v) (other partner, after 10 (days) notice to disabled partner to cure any default in the performance of the terms of the partnership agreement shall have the right to purchase disabled partner's interest at

the price fixed in section A of article XII thereof, or to dissolve the partnership); and November 28, 2000 amendment to Hansen Paper Company partnership agreement.

"A verdict is hereby entered in favor of the defendant, Stuart R. Hansen, only, and against the plaintiff, Roslyn K. Hansen, solely as executrix and personal representative of the estate of George C. Hansen Jr., on the defendant's Count Four counterclaim for return of advances to the plaintiff, Roslyn K. Hansen, solely as executrix and personal representative of the estate of George C. Hansen Jr., with respect to George C. Hansen Jr.'s one-half interest in the Hansen Paper Company general partnership, in the amount of $45,334.50 as a set-off from the damages awarded against him to the plaintiff, Roslyn K. Hansen, solely as executrix and personal representative of the estate of George C. Hansen Jr. 15 Pa.C.S. §8331; January 5, 1995 Hansen Paper Company partnership agreement, article XI, section C; article XII, section B 1 and 2 and schedule A; and November 28, 2000 amendment to Hansen Paper Company partnership agreement.

"A verdict is hereby entered in favor of the defendant, Stuart R. Hansen, only, and against the plaintiff, Roslyn K. Hansen, solely as executrix and personal representative of the estate of George C. Hansen Jr., on the defendant's Count Five counterclaim alleging George C. Hansen Jr.'s wrongful acts and breach of trust as to Hansen Paper Company funds pertaining to Nick Carlucci and Napcan in the amount of $84,280.75 as a set-off from the damages awarded against him to the plaintiff, Roslyn K. Hansen, solely as executrix and personal representative of the estate of George C. Hansen Jr. 15 Pa.C.S. §8327 (all partners are liable jointly and sever-

ally for everything chargeable to the partnership under sections 8325 (relating to wrongful act of partner) and 8326 (relating to breach of trust of partner and for all other debts and obligations of the partnership)); January 5, 1995 Hansen Paper partnership agreement, article VII, section A (the net profits of the partnership shall be divided between the partners and the net losses shall be borne by the partners in proportion to their [50 percent] share in the partnership).

"The total amount of damages to be set-off by the defendant, Stuart R. Hansen, only, from those awarded against him to the plaintiff, Roslyn K. Hansen, solely as executrix and personal representative of the estate of George C. Hansen Jr., is $228,557.23.

"It is further ordered and decreed that all other causes of action and claims for money damages and/or other forms of relief raised and/or pleaded by and between the plaintiff, Roslyn K. Hansen, in her own right and as executrix and personal representative of the estate of George C. Hansen Jr., the defendant, Stuart R. Hansen, and all other parties in the above-captioned matters will be, and hereby are, dismissed with prejudice.

"It is further ordered and decreed that the lis pendens entered with regard to the real property situate at 13 East Central Avenue, Paoli, Chester County, Pennsylvania and owned by the Hansen Paper Company general partnership, will be, and hereby is, stricken, and the defendants' motion to reconsider [their] petition to strike lis pendens is dismissed as moot.

"Judgments will be, and hereby are, entered in accordance with the foregoing verdicts." (Court's verdict, entered on April 21, 2006, pp. 1-5.)

Simply put, the verdict ordered specific enforcement of the buy/sell provision of the partnership agreement to the plaintiff in her capacity as George Hansen's successor in interest, and a set-off therefrom of sums counterclaimed for by the defendant that were attributable to the estate. Where these sums consisted of net partnership losses for which the partners would be jointly liable, they were divided in half pursuant to the express terms of the partnership agreement that the partners evenly split the liability for net partnership losses of any kind. (*Id.,* pp. 357-60.)

(15) The defendant has claimed that he reneged on purchasing the decedent's partnership interest on grounds that decedent, a year and a half before he died, was in material breach of the agreement which defendant unilaterally decided was voided in its entirety after George died. Nevertheless, there was no such allowance in the agreement which forbade lifetime dissolution of the partnership by the partners unless they followed certain procedures, a circumstance which never occurred, inasmuch as defendant rejected the notion outright. Moreover, it is clear from the evidence that defendant's winding up of the partnership's business affairs inured solely to his own benefit, and he has brazenly assured that his own wife will not suffer the fate he has visited upon his own brother's wife by making her a half owner of the corporation into which he distributed all of the partnership's assets, including his brother's, and indeed, plaintiff's share thereof. (*Id.,* p. 369.)

(16) It is axiomatic in the law, that the interpretation of "the law of the partnership" and the agreement in which it is expressed, is not in the hands of the defendant, nor of his trial counsel, but is a question for the court,

which must examine the intentions of the parties involved in its drafting and execution. *Block v. Mylish,* 351 Pa. 611, 41 A.2d 731 (1945); *Abbott v. Schnader, Harrison, Segal & Lewis, LLP,* 805 A.2d 547 (Pa. Super. 2002), *appeal denied,* 573 Pa. 708, 827 A.2d 1200 (2003) (table) . . . Moreover, since defendant's testimony was so vague and equivocal in regard to his familiarity with its terms, it remains doubtful that he has ever read the 1995 partnership agreement . . . By specific terms of the agreement and the actions and intentions of the brothers, the defendant, when paid the outstanding tax return money by the estate, will have received his full remedy for that loss. The partners agreed to assume half the liability for the Edwards net loss and George cured the breach by fulfilling his promise to do so. The defendant has taken pains to blame George for outstanding receivables that remained unpaid at the time of his death, but stated that he is making no claims for any contractual breaches attendant thereto. The defendant has played "poor mouth" to establish the company was barely solvent when George died as the reason he could not pay the plaintiff, yet his accountant and bank representative have thoroughly contradicted those representations. In short, there was no reason for the defendant not to pay the plaintiff besides his own unmitigated avarice and greed . . . . (*Id.,* pp. 369-70.)

(17) Defendant's contention that George's breach of trust in the Edwards matter worked a "constructive" dissolution of the partnership must utterly fail. (Defendant's proposed findings of fact and conclusions of law, ¶¶156-206.) This self-serving, and indeed, meritless, conclusion was defendant's alone under the "law of the partnership"— a construct purely of his own invention inasmuch it did

not also encompass a knowledge of partnership law. A review of partnership law, however, will lead to an entirely different conclusion. The partners made identical infusions of capital into the company to cover the Edwards net loss pursuant to a "handshake" agreement. (Defendants' proposed findings of fact and conclusions of law, ¶310.) However, where Stuart gave the company his tax refund of approximately $89,000 to complete his half share of recouping on those losses, the plaintiff refused to give George's $88,941.98 refund to the defendant to complete George's share thereof. This seems to have been the seminal event that gave the defendant an excuse to ignore the buy/sell agreement, and gave rise to this litigation. (Defendant's proposed findings of fact and conclusions of law, ¶¶312-320.) All tolled, George's capital contribution to Hansen Paper Company for the purpose of bringing the company's finances back to health after the Edwards loss of $1,634,662.01, was thus $630,000 of the approximate $720,000 he was supposed to give according to the evidence, with the tax refund of $88,941.88 that plaintiff refused to turn over making up the difference. (Defendant's proposed findings of fact and conclusions of law, ¶205.) The liabilities of the company as well as the profits were to be halved between the brothers pursuant to their 50 percent shares in the partnership. (Article VIII, trial exhibit P-9, p. 3.) Therefore, George was not liable, as contended before the court, for the entire Edwards' net loss, but for only $720,000 thereof, which amount, minus the unremitted tax refund by the plaintiff, has been nearly fully paid pursuant to the actions and intentions of the partners. The court's having ordered the capital infusion of the money the plaintiff withheld will erase her husband's liability for Edwards. (*Id.,* p. 371.)

262

(18) It is a foundational tenet of jurisprudence that parties must be bound by their agreements and that such agreements are enforceable in the law. The defendant appeared before this court contending ignorance of an agreement he had decided to void on his own volition based on self-serving and unsupported claims of massive losses to the company caused by his brother George. The facts adduced that George Hansen and the defendant had recouped the Edwards losses before George died, and that an approximate $188,000 in losses caused by George . . . had not yet been remedied and that half thereof was payable by George's estate pursuant to the brothers' agreement that net losses of any nature to the company be split in half. Even though the defendant was aware of the Edwards loss, claimed to be the "big" breach that purportedly voided the partnership agreement, he ignored his contractual remedies on grounds that he could not take the financial risk of doing so as well as raising other "family" related excuses. Nevertheless, in doing so, he allowed his brother to continue to abide by the agreement and infuse his share of capital into the company as required to cover the loss, only to deprive his brother's family of the awards from an agreement that George had thus honored. One needs only to ask whether George and Roslyn Hansen would have obtained the money to cover Edwards if they knew the defendant would exploit Edwards as the reason not to pay the plaintiff for his brother's share of the company. Some would suggest that it was not George, but the defendant who is the thief here who has stolen a company shown to generate some $23,000,000 in annual sales. (*Id.,* pp. 371-72, passim.)

(19) Again, succinctly stated, in light of the evidence that he allowed his brother to cure the Edwards breach

and readily joined in that process, and his own admission that he had not even read the agreement until after George was dead, the defendant wrongly assumed the robe of the courts of chancery and common pleas in interpreting the document thereafter as allowing him to void it for breach after dissolution of the partnership had been worked by George's death. Moreover, the evidence fully adduces that defendant waited until his brother's death to inflict a penalty he was too reluctant to impose when George was alive, and wilfully and intentionally either failed to inform himself and/or ignored the self-help provisions of the agreement, in order to boldly and audaciously appropriate George's interest therein solely for himself. Defendant is, nevertheless, correct in asserting that the partnership dissolved on George's death, and that the termination (which is the winding up of the business of the partnership) is governed by the Uniform Partnership Act. (*Id.,* ¶¶84-87.) However, misconstruing 15 Pa.C.S. §§8355,[3] 8359[4] of the Uniform Partnership

---

3. " Section 8355. Effect of dissolution on authority of partner

"Except so far as may be necessary to wind up partnership affairs or to complete transactions begun but not finished, dissolution terminates all authority of any partner to act for the partnership." 15 Pa.C.S. §8355.

It is here suggested that the title of this section was inferred by the defendant to grant permission, or authority, to terminate a partnership and the writing beneath to convey the instructions to be followed in that instance. The language of the heading instead is intended to convey what the effects of dissolution are to have upon the authority of the partner and not to bestow authority upon the defendant to so act on his own, whatever the reason.

4. "Section 8359. Right to wind up affairs

"Unless otherwise agreed, the partners who have not wrongfully dissolved the partnership, or the legal representative of the last surviving partner . . . has the right to wind up the partnership affairs except

Act, defendant claimed that he received sole authority as the surviving and liquidating partner to wind up the partnership's business at the time of and because of George's breach, when these sections convey no such authority under the circumstances presented in this case whatsoever. (*Id.* ¶¶88-93.) . . . [T]he 1995 agreement itself was binding and Stuart admittedly and repeatedly waived its self-help provisions which required him to give notice to George of the wrongdoing, and to either expel him from the partnership or buy him out for $1,000,000, both of which actions would have legally dissolved the partnership under agreement and the actual law. Nevertheless, it is defendant's firm and unwavering conviction that George's responsibility for the Edwards loss worked a constructive dissolution of the partnership all on its own. (Defendant's findings of fact and conclusions of law, ¶¶41-150.) It thus becomes necessary to test whether this self-serving and self-enriching conclusion was valid. (*Id.,* pp. 376-77.)

(20) The agreement accurately reflects the Uniform Partnership Act's (UPA) provision that all partners are liable "(1) jointly and severally for everything chargeable to the partnership under section 8325 (relating to wrongful act of a partner) and section 8326 (relating to breach of trust by partner) [and] (2) jointly for all other debts and obligations of the partnership . . . ." including those

---

that any partner, his legal representative or assignee, upon cause shown, may obtain winding up by the court." 15 Pa.C.S. §8359.

The agreement clearly and expressly required the defendant to give notice to his brother of his intent to dissolve the partnership and to follow express procedures by which the defendant would acquire George's interest therein. It is beyond cavil that the last thing on defendant's mind was presenting the issue to the court.

attributable to wrongful acts of a partner. 15 Pa.C.S. §8327, citing to sections 8325 and 8326. Section 8325 of the UPA states that: "Where, by any wrongful act or omission of any partner acting in the ordinary course of the business of the partnership or with the authority of his copartners, loss . . . is caused to any person, not being a partner in the partnership, or any penalty is incurred, the partnership is liable therefor to the same extent as the partner so acting or omitting to act." 15 Pa.C.S. §8325. Section 8326 (1) of the UPA, which governs "Breach of trust by partner, provides that "[t]he partnership is bound to make good the loss (1) Where one partner, acting within the scope of his authority, receives money or property of a third person and misapplies it." . . . The Pennsylvania Supreme Court has held that conversion, embezzlement, fraud and deceit, and misapplication of funds, is alone insufficient to remove it from the imposition of liability if otherwise it be committed in actual or apparent furtherance of partnership business. *First National Bank of Altoona v. Turchetta,* 407 Pa. 511, 181 A.2d 285 (1962) . . . However, it is unnecessary to probe these or any other issues further, because the agreement unqualifiedly provided that each partner shall bear the net losses of the company equally between them. (Article VII, trial exhibit P-9, p. 3.) Despite defendant's insistence of liability for the approximate $2,000,000 lost from the Edwards account, George was responsible only to split the net loss with the defendant and the evidence is clear that he did so before execution of the 2000 amendment which gave the defendant operational control of the company and continued the agreement in its original formulation. (*Id.,* pp. 377-78, passim.)

(21) Specific performance is an equitable remedy that permits the court to compel performance of a contract

where, as here, there exists a contract of agreement as to the nature of the performance. *Lackner v. Glosser,* 892 A.2d 21 (Pa. Super. 2006). Generally, on the subject of dissolving partnerships, a large discretion is placed in a court of equity and its decision will not be reversed in the absence of a finding of abuse of discretion. *Hankin v. Hankin,* 338 Pa. Super. 442, 487 A.2d 1363 (1985), *rev'd. in part on other grnds.,* 507 Pa. 603, 493 A.2d 675 (1985). The agreement governing the sale of plaintiff's late husband's half share of this partnership to the defendant specifically required the defendant to comply with its terms. The agreement and the law required a purchase price of $1,000,000 to be paid from insurance proceeds by the defendant to the plaintiff. Instead, the defendant wrongfully misappropriated those funds by keeping them entirely for himself . . . ." (*Id.,* pp. 382-83.)

The order currently appealed from states as follows:

### "ORDER[5]

"And now, June 17, 2010, upon consideration of the plaintiff's, Roslyn K. Hansen, petition for supplementary relief in aid of execution pursuant to Pa.R.C.P. 3118, and defendant's, Stuart R. Hansen, response thereto, as well as the memorandum of law submitted in support thereof, it is hereby ordered and decreed that said petition will be, and hereby is, granted.

"It is further ordered and decreed that:

---

5. It is here noted that the defendant has filed this appeal seeking review only from section "a" of this order directing him and the defendant, Hansen Paper Company Inc., to turn over to the sheriff all shares of stock in the Hansen Paper Company Inc.

"(a) Stuart Hansen and the Hansen Paper Company Inc. are directed to turn over to the sheriff all shares of stock in the Hansen Paper Company Inc.;

"(b) Hansen Paper Company Inc. is directed to turn over to the sheriff any and all non-exempt sums of money due to defendant, Stuart Hansen, until judgment is satisfied;

"(c) Defendant, Stuart Hansen, is directed to turn over to the sheriff any property subject to execution, including any cash or checks written to him that come into his possession, until the judgment is satisfied;

"(d) Defendant, Stuart Hansen, shall direct the sheriff to the whereabouts of any property subject to execution;

"(e) Hansen Paper Company Inc. is enjoined from altering in any way its method(s) of paying sums of money to Stuart Hansen (*e.g.* giving cash to Sue Hansen or writing checks to Sue Hansen or to Stuart Hansen and Sue Hansen jointly);

"(f) Defendant, Stuart Hansen, is directed to account for via affidavit to the court and to plaintiff's counsel every 30 days, any and all cash or property received by him and the location of that cash or property; and

"(g) Defendant, Stuart Hansen and Hansen Paper Company Inc., are directed to account for via affidavit to the court and to plaintiff's counsel every 30 days, any and all payments made on behalf of Stuart Hansen by the Hansen Paper Company Inc.

"Failure of defendant, Stuart Hansen or the Hansen Paper Company Inc., to abide by this order may result in the imposition of further sanctions upon application to the court.

"By The Court:

"Charles B. Burr, II     J."

The defendant's timely appeal from the foregoing order was followed by the submission of the following concise statement of matters complained of on appeal:

"(a) The court abused its discretion in failing to hold a hearing on the merits of the subject petition. Pa.R.C.P. 3118(a) states: "On petition of the plaintiff, *after notice and hearing,* the court . . . may enter an order against a party. . . ." [emphasis supplied] [sic]. Therefore, the court's failure to follow the mandate of the applicable rules [sic] of civil procedure is reversible error.

"(b) The court abused its discretion in making its ruling because, as a result of no hearing being held, and no evidence being introduced into the record in support of the petition, there is no evidence in the record to support the determination to require relinquishment of the subject stock.

"(c) The court abused its discretion in making its ruling because, as a result of no hearing being held, and no evidence being introduced into the record in support of the petition, there is insufficient evidence in the record to support the determination to require relinquishment of the subject stock.

"(d) The court abused its discretion in making its ruling due to [the] fact that the only evidence in the record supports a finding contrary to the determination by the court in that the subject stock has always been held by the [d]efendant and his spouse as tenants by the entireties and, therefore, not subject to execution or levy. *Stinner v. Stinner,* 300 Pa. Super. 351, 446 A.2d 651 (1982);

*Patwardhan v. Brabant,* 294 Pa. Super. 129, 439 A.2d 784 (1982).

"(e) That the court committed an error of law in ruling in effect that the subject stock was subject to execution and levy. It is well established through judicial interpretation that Pennsylvania adheres to the majority view which regards property held by tenants by the entireties as unavailable to creditors of one of the tenants. *Stinner v. Stinner,* 300 Pa. Super. 351, 446 A.2d 651 (1982); *Patwardhan v. Brabant,* 294 Pa. Super. 129, 439 A.2d 784 (1982)." (Defendant's concise statement of matters complained of on appeal, pp. 1-2.)

The defendant's issues, essentially in reverse order, will be discussed under the appropriate headings below.

### Ownership of the Company's Stock Certificate by the Entireties

Citing to the case authorities of *Stinner v. Stinner,* 300 Pa. Super. 351, 446 A.2d 651 (1982); *Patwardhan v. Brabant,* 294 Pa. Super. 129, 439 A.2d 784 (1982), the defendant contends that the court abused its discretion in issuing the subject order on grounds that the only evidence allegedly in the record supports a finding that the subject stock has always been held by the defendant and his spouse as tenants by the entireties and, therefore, not subject to execution or levy. (Concise statement, paragraph d.) Defendant further alleges that the court erred in ruling in effect" that the subject stock was subject to execution and levy because "it is well established through judicial interpretation that Pennsylvania adheres to the majority view which regards property held by tenants by the entireties as unavailable to creditors of one

of the tenants. *Stinner v. Stinner,* [*supra*]; *Patwardhan v. Brabant,* [*supra*]." (Concise statement, paragraph e.)

It has been shown in the foregoing excerpts from this court's prior opinion submitted following the defendant's appeal from the denial of his post-verdict motions, that the defendant had no power or right to convey his brother's one-half interest in The Hansen Paper Company to anyone prior to lawfully obtaining ownership of that interest himself, an act which he has thus refused to perform by submitting the sale price to the plaintiff. The defendant provided the court with the copy of a purported stock certificate for 1,000 shares in The Hansen Paper Company Inc. issued to the defendants, Stuart R. and Sue Hanson, and signed by the defendant, Stuart R. Hansen, on January 21, 2002, before the within action to enforce the buy/sell provision was even filed. (Defendant, Stuart R. Hansen's, motion for partial reconsideration of the order dated June 17, 2010, exhibit B.)

It is generally true that entireties property is not subject to execution. Cf., *Gross v. Laver,* 96 Del. 419 (2009) (direct depositing of the defendant's paychecks into a joint personal bank account owned by him and his spouse by the entireties was a continuing fraudulent transfer under Pennsylvania's Uniform Fraudulent Transfer Act (PUFTA), 12 Pa.C.S. §5101 et seq.). Nevertheless, the defendant has abjectly failed to show that the proffered stock certificate in The Hansen Paper Company Inc. was owned by the entireties by him and his wife. Whatever the provenance of the original copy of the defendant's unauthenticated, newly discovered stock certificate allegedly evincing ownership of the company by him and his wife by the entireties since January 21, 2002, the plaintiff has shown that the subject stock certificate is

not genuine or a reliable representation of fact, inasmuch as the 2008 IRS return for the defendant, The Hansen Paper Company Inc., states that the defendant, Stuart R. Hansen, alone, owns a 100 percent interest in the company. (Plaintiff's memorandum of law in opposition to defendant's motion for partial reconsideration of the June 17, 2010 order, exhibit A, p. 3.) The plaintiff has also submitted a portion of the sworn deposition of the defendant, Sue Hansen, taken on March 17, 2010, stating essentially that she has little at all to do with the company and does not consider herself an owner of the business. (*Id.,* exhibit B, pp. 85-92.) Indeed, when asked who is the owner of The Hansen Paper Company Inc., Sue Hansen provided a reply totally contradictory to her husband's contention sub judice by answering simply, "Stuart." (*Id.,* exhibit B, p. 92.)

For all of the foregoing reasons, the defendant, Stuart R. Hansen, has failed to demonstrate that both he and his wife own the defendant, The Hansen Paper Company Inc., by the entireties, and that, as such, the subject stock certificate was not subject to execution. Further, had a Rule 3118 hearing been held on the plaintiff's petition, Sue Hansen's deposition testimony that the defendant owns the company in combination with the 2008 IRS return for the business adducing that Stuart Hansen is its 100 percent owner would have proved conclusive on that issue. It was, therefore, both fitting and proper to deny the defendant's plea to shield the company's stock certificate from the plaintiff's continuing and still unsuccessful attempts to execute on this now nearly five-year-old judgment against the defendant on grounds that it was owned by the defendant and his wife by the entireties.

*Hearing Requirement of Pa.R.C.P. 3118(a)*

The defendant also contends that the court abused its discretion and committed reversible error in failing to hold a hearing on the merits of the subject petition in aid of execution on this judgment on grounds that the language of Pennsylvania rule of civil procedure 3118(a), which states: [o]n petition of the plaintiff, after notice and hearing, the court . . . may enter an order against a party . . .", assertedly mandates that one be held. (Concise statement, paragraph a.) The defendant additionally claims that, as a result of no hearing being held, and allegedly no evidence being introduced in support of the plaintiff's petition for relief, there was insufficient evidence in the record to support the determination to require relinquishment of the subject stock certificate. (Concise statement, paragraphs a, b and c.)

While the language of rule 3118(a) ostensibly requires such a hearing, subsection (2)(e) of Pa.R.C.P. 3111, governing the effect of a service of a writ of execution on a party, warns that: "[s]ervice of the writ upon the garnishee shall also subject the garnishee to the mandate and injunctive orders of the writ restraining the garnishee from paying any debt to or for the account of the defendant and from delivering any property of the defendant which may be attached under these rules to anyone except the sheriff or otherwise disposing thereof until further order of the court or discontinuance or termination of the attachment." (*Id.*) Moreover, the note to Rule 3118 states that, "[s]ervice of a writ of execution against a garnishee enjoins the garnishee as provided in Rule 3111 but supplementary aid may be obtained under this rule against any party or person without the neces-

sity of separate proceedings in aid of execution." (*Id.*) The defendant's insistence that a Rule 3118 hearing was mandated herein is misplaced under the settled law of this Commonwealth applied to the facts of this case. In *Gulf Mortgage and Realty Investments v. Allen,* 282 Pa. Super. 230, 237, 422 A.2d 1090, 1094 (1981), the Pennsylvania Superior Court set forth the following reasoning as to why such a hearing is not always necessary:

"Appellant argues, however, that he was denied the hearing required by Rule 3118. The difficulty with this argument is that there were no issues of fact for the lower court to resolve; appellant's answer admitted every relevant factual allegation in the petition for supplementary relief—specifically, the existence of the judgment and appellant's ownership and possession of the shares [in the corporation]—only pleading that for various legal reasons, the relief requested should not be granted. Thus, as the lower court observed at the beginning of its opinion, the matter came before the court on the petition, rule and appellant's answer. (Slip op. at 1) . . . Rule 3118 does not require extended proceedings in aid of execution." *Id.*

Citing to 9 Goodrich-Amram 2d section 3118(a), the *Alten* court observed:

"The proceedings [required by Rule 3118(a)] are, however, summary rather than plenary. . . Something less than a 'full hearing' is envisioned by Rule 3118. Its proceedings are designed to be summary in nature, consonant with its primary function of maintaining the status quo or restoring it in the face of concealment by the defendant of property clearly his." *Id.*

In the case of *Kaplan v. I. Kaplan Inc.,* 422 Pa. Super. 215, 619 A.2d 322 (1993), *appeal denied,* 535 Pa. 675,

636 A.2d 634 (1993) (table), the Superior Court went further:

"However, the rule of law we extract from the case law is that the nature of a Rule 3118 proceeding is strictly limited, regardless of which party is assisted thereby. We are convinced . . . (citation omitted) that the predicates to Rule 3118 relief in this case are the existence of an underlying judgment and property of the debtor subject to execution. To require the trial court to delve into the validity of the judgment, even where the debtor alleges facial errors, is to require too much. This is particularly true because the grant of relief does nothing more than maintain the status quo of a debtor's property.

"For the same reason that the trial court need not review the validity of a judgment, it need not require a showing of the traditional requirements for an injunction; this is simply not required by the rule. Our decision is supported by this court's opinion in *Gulf Mortgage and Realty Investments v. Alten* [*supra*]. In *Gulf Mortgage,* we upheld an order of the trial court compelling a judgment debtor to deliver to the sheriff various stock certificates. In addition to claiming that the certificates were not subject to execution, the debtor claimed that, despite the fact that his counsel had an opportunity to argue orally the merits of the issue, he was denied a hearing as required by Rule 3118. The court held that even though the debtor did not receive a hearing, the lower court's grant of relief was proper because the debtor admitted in his answer the allegations necessary for resolution of the petition:

" '[A]ppellant's answer admitted every relevant factual allegation in the petition for supplementary relief—

specifically, *the existence of the judgment and appellant's ownership and possession of the shares . . . .'* [*Gulf Mortgage, supra*], at 237, 422 A.2d at 1094. (emphasis supplied)

"In the instant case, appellants do not claim the underlying confessed judgment does not exist, they challenge its validity. We find their challenge is misplaced and cannot be considered by the court. It is the existence of the judgment that permitted the trial court to consider and grant relief under Rule 3118. A full hearing on the traditional injunction requirements is not mandated by the rule; therefore, we make no findings with respect to the judgment's propriety and must disregard appellants' arguments based thereon." *Kaplan v. I. Kaplan Inc., supra,* 422 Pa. Super. at 220-22, 619 A.2d at 326.

## CONCLUSION

The facts of this case, particularly as they concern plaintiff's efforts to execute on this judgment, are well known to the parties, given the time and proceedings already devoted to litigating the issue. There is no question that the defendant owes the outstanding sum thereof, nor has there been any effort on his part to deny it, other than in terms of the amount still owing. There is no question that the defendant alone owns a 100 percent interest in The Hansen Paper Company Inc., in light of his wife's deposition testimony that Stuart R. Hansen, and Stuart R. Hansen alone, owns the business in question coupled with the company's 2008 IRS return adducing the same evidence, and that it is, therefore, subject to attachment in execution on the within judgment against him. *Skinner v. Skinner, supra; Patwardhan v. Brabant,*

*supra; Kaplan v. I. Kaplan Inc., supra; Gulf Mortgage and Realty Investments v. Alten, supra.*

For all of the foregoing reasons, this court's order granting plaintiff's petition for supplemental relief in aid of execution of her judgment against the defendant was not erroneous under the law and it must not be disturbed on appeal.